BANK OF AMERICA CORPORATION; Bank of America, N.A.; Bank of America Overseas Corporation; and Bankamerica International Financial Corporation, Plaintiffs,

v.

Antonio Carlos Braga LEMGRUBER; Goldbeach Holdings Corporation; Powerstone Corporation; Timber Springs Corporation; Tiger International Overseas Corp.; American Versailles Fund; Santa Escolastica, Inc.; Interbrett Investec Group; Blue Water Capital; Agropastoril Aventura Ltda.; Delaware Asset Management Adm Financiera E Consultoria; Rio Aventura, Inc.; and SP Funds LLC, Defendants.

No. 02 Civ.1041(DAB).

United States District Court, S.D. New York.

Jan. 5, 2005.

204

Stephen James Marzen, Stuart J. Baskin, Shearman & Sterling, LLP, Washington, DC, for Plaintiffs.

James A. Philpott, Jr., Lexington, KY, for Defendants.

## OPINION

BATTS, District Judge.

Plaintiffs Bank of America Corporation ("BAC"), Bank of America, N.A. ("BNA"), Bank of America Overseas Corporation ("BAOC"), and BankAmerica International Financial Corporation ("BIFC") (collectively "Plaintiffs") bring this action alleging fraudulent inducement, conversion, breach of fiduciary duty, and breach of contract. Defendants, Antonio Carlos Braga Lemgruber ("Lemgruber"), Agropastoril Aventura Ltda. ("Agropastoril"), Rio Aventura, Inc. ("Rio Aventura"), and SP Funds LLC ("SP Funds") (collectively, the "Lemgruber Defendants" or "Defendants")[1] now move to dismiss the Complaint for lack of subject matter jurisdiction, lack of standing to sue, failure to state a legally sufficient claim, and failure to join real parties in interest pursuant to Rules 8(c), 9(b), 12(b)(1), 12(b)(6), 12(b)(7), and 19 of the Federal Rules of Civil Procedure, and on grounds of forum non conveniens.[2] For the reasons stated below, the Lemgruber Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

The present action arises out of Plaintiffs' three-phase purchase of the stock of a

---

1. Plaintiffs have voluntarily dismissed Defendant Menocal Capital Management from this action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(*see* Plaintiff's Notice of Voluntary Dismissal, dated February 4, 2003), and Defendants Aldo Floris, Lauro Alberto De Luca, Liberal Financial Services E. Participacoes, LTDA, and Liberal International Limited with prejudice pursuant to a stipulation signed by them and Plaintiffs. (*See* Stipulation, dated March 26, 2003).

As for the remaining Defendants, Santo Escolastica answered the Complaint; Defendants Goldbeach Holding Corp., Powerstone Corp., Timber Springs Corp., Tiger International Overseas Corp., Blue Water Capital, and Delaware Asset Management ADM Financiera e Consultoria have been served with but have yet to respond to the Complaint; and Plaintiffs have been unable to locate Defendants Interbrett Investec Group and American Versailles Fund to serve them. *See* Footnote 7, *infra.* The Court shall address the status of these Defendants within.

2. While Defendants state in their notice of motion that they move for dismissal on forum non conveniens grounds pursuant to Federal Rule of Civil Procedure 12(b)(3), Rule 12(b)(3) is not the correct vehicle for such a motion because forum non conveniens is a separate and discreet doctrine which rests on the "inherent authority of the federal courts" rather than on any statute or court rules. *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,* 158 F.Supp.2d 377, 379 n. 3 (S.D.N.Y.2001), *aff'd,* 311 F.3d 488 (2d Cir. 2002); *see also Palace Exploration Co. v. Petroleum Development Co.,* 41 F.Supp.2d 427 (S.D.N.Y.1998) (treating 12(b)(3) and forum non conveniens as separate grounds for dismissal); *ESI, Inc. v. Coastal Power Production Co.,* 995 F.Supp. 419 (S.D.N.Y.1998) (same). Accordingly, the Court will not treat Defendants' forum non conveniens argument as a Rule 12(b)(3) motion.

Brazilian bank, Banco Liberal S.A. ("BL Brazil"), and several of its affiliates, including a Liberal Banking Corporation, Ltd., a Bahamian Bank ("BL Bahamas"), (collectively the "BL Banks"[3]), from Defendant Lemburger and former Defendants Floris and De Luca, who allegedly took part in a scheme to defraud Plaintiffs by embezzling millions of dollars from the BL Banks and concealing from Plaintiffs both the embezzlement and other information that depreciated the value of the stock and assets that Plaintiffs acquired.

## A. The Parties

Plaintiff BAC is a multi-bank holding company incorporated in Delaware with its headquarters in North Carolina. (Compl. ¶ 8). BAC is the successor in interest to NationsBank Corporation ("NationsBank"), who originally contracted with Defendants to purchase the BL Banks in 1998. (*Id.* ¶¶ 8, 17). Plaintiff BNA is an indirect wholly-owned subsidiary of BAC, headquartered in North Carolina, and is the successor by merger to NationsBank, National Association. (*Id.* ¶ 9). BNA was formed as a national bank organized under the laws of the United States and thus its presence as a party to this action would satisfy the first requirement for the Court's exercise of subject matter jurisdiction under the Edge Act.[4] (*Id.*) Plaintiff BAOC, a wholly-owned subsidiary of BNA, was formed in 1980 as an Edge Act Corporation under the laws of the United States[5] and is headquartered in Charlotte, North Carolina. (*Id.* ¶ 10). Plaintiff BIFC was also formed as an Edge Act corporation and is headquartered in San Francisco, CA. (*Id.* ¶ 11). BNA, BAOC, and BIFC are hereinafter collectively referred to as the "Edge Act Plaintiffs."

Defendant Lemgruber is a resident and citizen of Brazil. (Compl. ¶ 12). Prior to Plaintiffs' purchase of the BL Banks' stock, Lemgruber owned significant minority stakes in both BL Brazil and BL Bahamas. (*Id.*) In addition, during the time period relevant to this action, he was an officer and director of both BL Banks with primary responsibility for managing operations of BL Brazil's overseas' affiliates, including BL Bahamas. (*Id.*; Declaration of Jared Goldstein ["Goldstein Decl."], Ex. D (Management Agreement Between BAC, the BL Banks, and Lemburger, dated January 23, 1998)[6]).

---

3. In their Complaint, Plaintiffs refer to these two banks collectively as the "Banco Liberal Group." (Compl. ¶ 2). However, as stated in their memorandum of law opposing Defendants' motion, they adopt Defendants' terminology of "BL Banks." (*See* Pl. Mem. at 1). Therefore, "BL Banks" will be used by the Court throughout this Opinion.

4. *See* 12 U.S.C. § 632 ("[A]ll suits of a civil nature ... to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, ... or out of other international or foreign financial operations ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits ...").

5. An "Edge Act Corporation" is a corporation organized "for the purpose of engaging in international or foreign banking or other international or foreign financial operations," 12 U.S.C. § 611, and is organized as provided for in Subchapter II of the Edge Act itself, 12 U.S.C. §§ 611–633. Thus, an Edge Act corporation is necessarily organized under the laws of the United States.

6. Although Plaintiffs technically submitted the first Goldstein Declaration in opposition to the Floris Former Defendants' Motion to Dismiss, Plaintiffs have incorporated it by reference into their opposition to the Lemgruber Defendants' motion as well. (*See* Plaintiffs' Memorandum of Law in Opposition to Lemgruber Defendants' Motion to Dismiss ["Pl. Mem."] at 2 n. 3).

The remaining Defendants are entities that Plaintiffs allege were either directly controlled by Defendant Lemgruber or, in the alternative, were sufficiently independent to have conspired with Lemgruber to engage in the allegedly fraudulent transactions that gave rise to this action. (Compl. ¶ 13). Defendants Goldbeach Holdings Corporation ("Goldbeach"), Powerstone Corporation ("Powerstone"), Timber Springs Corporation ("Timber Springs"), and Tiger International Overseas Corporation ("TIOC") are incorporated in the British Virgin Islands. (*Id.*). Defendants Agropastoril Aventura Ltda. and Delaware Asset Management Adm. Financiera e Consultoria ("Delaware Asset") are incorporated in Brazil. (*Id.*). Defendant Blue Water Capital is incorporated and headquartered in Virginia (Goldstein Decl. ¶ 9, Exs. J and K), while Defendants Santo Escolastica, Inc. and Rio Aventura Stables, Inc. are incorporated and headquartered in the state of Kentucky. (Compl. ¶ 13; Goldstein Decl. ¶ 8, Exs. F and G). Defendant SP Fund is also incorporated in Kentucky with its principal place of business located in Versailles, Kentucky. (Second Declaration of Jared Goldstein ["Goldstein 2nd Decl."] ¶ 2, Ex. 1).[7]

## B. The Three–Stage BL Bank Stock Acquisition

### 1. The 1998 Stock Purchase

In 1998, BAC, then NationsBank, decided to expand its presence in the investment banking market through the purchase of a majority stake in the BL Banks. (Compl. ¶ 17). At that time, Former Defendants Floris and De Luca and Defendant Lemgruber (collectively referred to as "Sellers") owned or controlled all shares and managed the operations of the BL Banks. (*Id.* ¶¶ 18–19).

On January 13, 1998, BAC entered into a Stock Purchase Agreement (hereinafter the "1998 Stock Purchase Agreement") with the Sellers[8] through which Plaintiffs acquired 51% of the stock of the BL Banks[9] for approximately $115 million. (Compl. ¶ 20; Declaration of Chaya F. Weinberg–Brodt ["Weinberg–Brodt Decl."][10] Ex. B (Fully executed Copy of the 1998 Stock Purchase Agreement)). BAC, as a successor to Nationsbank, is the only plaintiff who was a party. (Weinberg–Brodt Decl., Ex. B at 1). The 1998 Stock Purchase Agreement permitted NationsBank (now BAC) or "one or more of its indirect subsidiaries" to acquire not less than 51% of the shares of the BL Brazil, and 51% of the shares of BL Bahamas.

---

**7.** Plaintiffs suggest that Defendants Investec Interbrett Group and American Versailles Fund are unincorporated entities. (Goldstein Decl., ¶ 11). The Complaint fails to list any corporate information on either of them, and Plaintiffs' further investigations subsequent to the drafting of the complaint reveal that their names are not listed on several recognized corporate search websites. (*Id.*)

**8.** Former Defendants Liberal International Limited ("LIL") and Liberal Financial Services e Participacoes, Ltda. ("LFS"), who were owned and controlled by Sellers during all times relevant to this action, were also listed as sellers in and were signatories to this Agreement. (Compl. ¶ 12).

**9.** BL Brazil was included as a party to and also signed the Agreement. BL Bahamas was not listed as a party, nor was it a signatory to the Agreement.

**10.** Although the Floris Former Defendants submitted the Weinberg–Brodt Declaration in support of their motion to dismiss, the Lemgruber Defendants have explicitly incorporated it and the rest of the Floris Former Defendants' motion papers into their motion to dismiss. (*See* Notice of Motion by the Lemgruber Defendants to Dismiss the Complaint, at 2).

(*Id.* at 1). In addition, section 11.2 of the Agreement contained a call option granting BAC, or one of its subsidiaries, the right to purchase the remaining shares of the BL Banks at a price to be determined according to the BL Banks' financial statements at the time of sale. (Compl. ¶ 30; Weinberg–Brodt Decl., Ex. B at 60).

The 1998 Stock Purchase Agreement also contained many representations and warranties certified by the Sellers regarding the financial condition of and other important information about the BL Banks. For example:

— In § 3.4 of the Agreement, the Sellers certified that the Balance Sheets and Interim Balance Sheets they provided to NationsBank "fairly present the financial condition ... of the [BL Banks]." (Compl. ¶ 22; Weinberg–Brodt Decl., Ex. B at 22–23).

— In § 3.10, Sellers certified that the BL Banks had "no undisclosed liabilities or obligations of any nature (whether known or unknown and whether absolute accrued, contingent or otherwise) except for liabilities or obligations reflected or reserved against in the Balance Sheets or the Interim Balance Sheets ..." (Compl. ¶ 23; Weinberg–Brodt Decl., Ex. B at 26).

— In § 3.14(a)(i), Sellers certified that since 1993 the BL Banks had been "in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business." (Compl. ¶ 24; Weinberg Brodt Decl., Ex. B at 30).

— In § 3.15(a), Sellers certified that to their knowledge "no Proceeding has been threatened, and no event has occurred or circumstances exists that may give rise to or serve as the basis for the commencement of any such Proceedings." (Compl. ¶ 25; Weinberg–Brodt Decl., Ex. B at 31).

— In § 3.24(c), Sellers certified that "[t]here is no fact known to any of the Sellers ... that materially adversely affects, or as far as any Seller can reasonably foresee, materially threatens, the business, operations, properties, prospects, assets, liabilities or condition" of the BL Banks. (Compl. ¶ 26; Weinberg–Brodt Decl., Ex. B at 41).

— In § 3.25, Sellers certified that neither Sellers nor any other related person "has, or has had any interest in any property ... used in or pertaining to the [BL Banks'] businesses," or except as disclosed has "(i) made any loan to or received any loan from, [the BL Banks], (ii) had any business dealings or any material financial interest in any transaction with [the BL Banks] other than in ordinary course of business with the [BL Banks] at substantially prevailing Market rates." (Compl. ¶ 27; Weinberg–Brodt Decl., Ex. B at 41–42).

The Agreement also contains an indemnification provision. Under section 10.2 of the Agreement, Sellers agreed to indemnify BAC and its affiliates for "any loss, liability, claim, damage ..., expense ... or diminution in value, whether or not involving a third-party claim ... arising directly or indirectly, from or in connection with: (a) any Breach of any representation or warranty made by Seller or [BL Brazil] in this Agreement ... or any other certificate or document delivered by Sellers or the Brazilian Bank pursuant to the Agreement; or (b) any Breach by any Seller or the Brazilian Bank of any covenant or obligations of such Seller or the Brazilian Bank in this agreement." (Compl. ¶ 34; Weinberg–Brodt Decl., Ex. B at 52–53).

While BAC was a signatory to the 1998 Stock Purchase Agreement, the BL Brazil shares were actually acquired by Nationsbank Brasil Holdings, Ltda. (now Bank of America Brasil Holdings Ltd. or "Brasil Holdings"), a Brazilian holding company, and the BL Bahamas shares were actually acquired by NB Bahamas Ltd. ("Bahamas Holdings"), a Bahamian holding company. (Declaration of Glenn Danzinger ["Danzinger Decl."] ¶¶ 7–8; Weinberg Brodt Decl., Ex. B. § 2.3(a)(ii) and iii). Brasil and Bahamas Holdings, which were each created for the sole purpose of holding shares in their respective BL Banks, are in turn subsidiaries of BIFC and BAOC, Brasil Holdings being jointly owned by BIFC and BAOC, while Bahamas Holdings is wholly-owned by BAOC. (Danzinger Decl. ¶¶ 7–8). However, neither BIFC, BAOC, nor BNA acquired any shares in the BL Banks through the 1998 stock purchase, though BAOC allegedly contributed $50 million to the capital of BL Brazil. (Compl.¶ 29). Moreover, Brasil and Bahamas Holdings, not BAC, were parties to the BL Brazil and BL Bahamas Shareholder Agreements executed on January 23, 1998. (*See* Weinberg–Brodt Decl., Exs. C and D).

Finally, while the 1998 stock purchase transferred majority ownership of the BL Banks to BAC, Lemgruber, Floris and De Luca maintained managerial control over them. (Compl.¶ 28). Section 2.3 of the 1998 Stock Purchase Agreement called for each of them to execute a Management Agreement with BAC and the BL Banks, and Lemgruber and De Luca did so on January 23, 1998, while Floris did so on May 13, 1998. (Goldstein Decl., Exs. B–D (Management Agreements for Floris, De Luca and Lemgruber)).

2. The 2000 and 2001 Stock Acquisitions

In March 2000, BAC first exercised its Call Option under the 1998 Stock Purchase Agreement to purchase an additional 19% of the BL Banks stock in exchange for approximately $52.6 million. (Comp.¶ 31). Once again, the shares were actually acquired by Brazil and Bahamas Holdings, and BAC was the only Plaintiff who was party to the 2000 Stock Purchase Agreement. (Weinberg–Brodt Decl., Ex. E (Letter Amendment to the 1998 Stock Purchase Agreement, dated January 18, 2000)).

Thereafter, in April 2001, BAC again exercised its Call Option under the 1998 Stock Purchase Agreement to acquire the remaining 30% of the BL Banks' stock for approximately $86.4 million. (Compl.¶ 32). There were two 2001 Stock Acquisition Agreements, one for the purchase of the remaining 30% of BL Brazil stock and the other for the purchase of the remaining 30% of BL Bahamas stock. (*See* Weinberg–Brodt Decl., Exs. F and G). None of Plaintiffs were signatories to either of these agreements. Instead, Brasil Holdings, which acquired the remaining BL Brazil shares, was party to the BL Brazil Share Purchase Agreement, while Bahamas Holdings, which acquired the remaining BL Bahamas shares, was party to the BL Bahamas Share Purchase Agreement. (*Id.;* Danzinger Decl. ¶¶ 7–8). However, both of the 2001 Share Purchase Agreements specifically state that they were made pursuant to BAC's Call Option in the 1998 Stock Purchase Agreement. (Weinberg–Drodt Decl., Exs. F and G). In addition, as part of these 2001 Agreements, the Sellers allegedly re-certified the warranties contained in the 1998 Stock Purchase Agreement regarding the BL Banks' financial condition. (Compl. ¶ 32; Weinberg–Brodt Decl., Ex. H).

While neither BNA, BIFC nor BAOC directly purchased any of the BL Banks' stock during the three-phase stock purchase, Plaintiffs allege they did contribute

funding for the 2001 Stock Purchase Agreement as follows: BIFC and BAOC borrowed $86.4 million from BNA under a revolving line of credit, $27.8 million borrowed by BIFC and $58.6 million borrowed by BAOC. (Danziger Decl. ¶ 11). BIFC and BAOC then made an equity contribution totaling $46.3 million to Brazil Holdings, which was used to acquire the remaining 30% of BL Brazil stock. (*Id.*) BAOC also made an equity contribution of $40.1 million to Bahamas Holdings, which the latter used to acquire the remaining 30% of BL Bahamas stock. (*Id.* ¶ 12). In addition, Plaintiffs allege that "the possessory interests" acquired through the three-phase stock acquisition are currently held by BAOC and BIFC. (Compl.¶ 33).

C. Defendants' Alleged Fraud

1. Overdrafts and Cover–Ups

Beginning shortly after the completion of the 1998 Stock Purchase and continuing through the 2001 Stock Acquisition, Defendant Lemgruber allegedly embezzled the assets of the BL Banks by initiating approximately $24 million worth of illegal overdrafts from his personal account and the accounts of companies allegedly under his control. (Compl.¶ 36). The bulk of those monies, almost $ 20 million, allegedly went directly to Lemgruber himself and to Defendants Santa Escolastica, Timber Springs Corporation, Agropastoril Aventura Ltda., Deleware Asset Management Adm. Financiera e Consultoria, Rio Aventura Stables Inc., SP Funds, Interbrett Investec Group, Goldbeach, Tiger International Overseas Corporation, American Versailles Fund and Powerstone. (*Id.* ¶ 37).

In addition, Lemgruber allegedly attempted to conceal these overdrafts from Plaintiffs by forging documents and executing a series of fraudulent transactions to create fictitious assets that appeared to offset the overdrafts in the BL Banks'

financial statements. (Compl.¶ 42). For example, Plaintiffs allege that on or about March 9, 2001, Lemgruber, through his control and by conspiring with Defendants Powerstone and Goldbeach, conducted a series of fraudulent transactions creating $24 million in fictitious certificates of deposits ("CDs"). (*Id.* ¶ 43). In addition, to bolster BL Bahamas' assets, Lemgruber allegedly created other false documents for other fraudulent transactions, including the issuance of bogus loans from BL Bahamas, which were then booked as BL Bahamas assets. (*Id.* ¶ 46). Finally, on or about June 25, 2001 Lemgruber allegedly attempted to cover-up the fictitious CDs by creating documents that purported to swap the fictitious CD's and BL Bahamas' interest in the bogus loans it had purportedly issued for $28.7 million in other fictitious CD's and Brazilian government bonds. (*Id.* ¶ 47).

Through this overdraft and cover-up scheme, the Lemgruber Defendants were allegedly able to embezzle approximately $38 million in BL Bank assets and to inflate by many millions of dollars the purchase price paid by Plaintiffs in the 2001 Stock Acquisition by including phony assets on BL Bahamas' books. (Compl.¶ 49).

2. Failure to Disclose Administrative and Criminal Investigations Against BL Banks

In addition to the overdraft and cover-up scheme, Lemgruber and former Defendants Floris and De Luca allegedly failed to disclose to Plaintiffs prior to either the 2000 or 2001 Stock Acquisitions that, beginning in 1999 and continuing to the present, Brazilian authorities instituted a series of administrative proceedings and criminal investigations against them and other BL Banks' officers alleging fraudulent misrepresentations, illegal speculation

and other violations of Brazilian law. (Compl. ¶¶ 50–53; 57–59). In April 2001, Lemgruber, Floris and De Luca allegedly expressly certified that the representations and warranties contained in § 3 of the 1998 Stock Purchase Agreement, which declared, among other things, that (1) the BL Banks were in full compliance with all applicable legal requirements, (2) no legal proceedings had been threatened against the BL Banks, (3) the BL Banks had no undisclosed liabilities or obligations except those reflected in the balance sheets, and (4) the Sellers did not know of any facts that materially adversely affected the business of the BL Banks, were still true. (*Id.* ¶¶ 57–61) (Weinberg–Brodt Decl., Ex. H). Similarly, at the time of the 2000 Stock Acquisition, Lemgruber, Floris and De Luca allegedly failed to disclose that the 1998 certifications were no longer true. (*Id.* ¶ 62).

The administrative proceedings and criminal investigations, along with the alleged overdrafts, sham covering transactions and bogus loans created liabilities and obligations of the BL Banks that were not fairly presented in the BL Banks' balance sheets. (Compl. ¶ 62). However, Plaintiffs, relying on Lemgruber, Floris and De Luca's allegedly false re-certifications of the 1998 warranties, went through with the 2000 and 2001 Stock Acquisitions and ended up paying more than $139 million for assets allegedly worth substantially less. (*Id.* ¶¶ 65–66). In addition, Plaintiffs are now responsible for the costs of defending the BL Banks in the on-going administrative and criminal proceedings. (*Id.* ¶ 54).

**D. The Present Action**

On February 11, 2002, Plaintiffs commenced the present action, asserting: (1) a fraudulent inducement claim against the Lemgruber Defendants for making the above-mentioned misrepresentations and omissions which allegedly induced Plaintiffs to consummate the 2000 and 2001 Stock Acquisitions at prices which far exceeded the actual value of the BL Banks' stock; (2) a conversion claim against Lemgruber for his alleged embezzlement of $38 million in BL Bank assets to which Plaintiffs' have a legal right and immediate superior right of possession; (3) a breach of the fiduciary duty claim against Lemgruber for embezzling the BL Bank funds while manager of the BL Banks and against the other Lemgruber Defendants for conspiring with him to commit such embezzlement; and (4) a breach of contract claim against Lemgruber for breaching the warranties in § 3 of the 1998 Stock Purchase Agreement by providing untrue re-certifications of the warranties and representations at the time of the 2001 Stock Purchase. (Compl. ¶¶ 75–110).

## II. DISCUSSION

The Lemgruber Defendants move to dismiss this action on several grounds. First, they urge dismissal pursuant to F.R.C.P. 12(b)(1) on grounds that the Court cannot properly exercise either Edge Act or diversity subject matter jurisdiction over this case. Second, they contend that all Plaintiffs lack standing to sue for either conversion or breach of fiduciary duty and that BNA, BIFC and BAOC also lack standing to sue for fraudulent inducement and breach of contract. Third, Defendants argue that the fraudulent inducement, breach of fiduciary duty and breach of contract claims should be dismissed pursuant to Rules 12(b)(6) and 9(b) because Plaintiffs have not adequately pled justifiable reliance. Fourth, Defendants urge dismissal under Rules 12(b)(7) and 19(b) for Plaintiffs' failure to join indispensable parties, namely Brasil Holdings, Bahamas Holdings and the BL Banks. Finally, Defendants move for dismissal on grounds of forum non conveniens.

## A. Subject Matter Jurisdiction

### 1. Rule 12(b)(1) Dismissal

■ While a Court considering a challenge to subject matter jurisdiction under Rule 12(b)(1) must "accept as true all material factual allegations in the complaint," *Shipping Financial Serv. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998), "the burden of proving jurisdiction is on the party asserting it ... to make a prima facie showing of jurisdiction." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). (citing *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364 (2d Cir.1986)). Moreover, "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Financial,* 140 F.3d at 131; *see also Robinson,* 21 F.3d at 507 ("In determining whether a plaintiff has met this burden, we will not draw argumentative inferences in the plaintiff's favor."); *London v. Polishook,* 189 F.3d 196, 199 (2d Cir.1999) ("[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction ... to proffer the necessary factual predicate—not just an allegation in a complaint— to support jurisdiction.") (citations omitted). Therefore, when resolving issues surrounding its subject matter jurisdiction, a district court is not confined to the Complaint and may refer to evidence outside the pleadings, such as affidavits. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1011 (2d Cir.1986)).

Plaintiffs have asserted two bases for this Court's exercise of subject matter jurisdiction over the present case: (1) federal question jurisdiction under the Edge Act, 12 U.S.C. § 632, and (2) diversity jurisdiction under 28 U.S.C. § 1332. (Compl.¶ 14). Accordingly, the Court shall address each of these jurisdictional bases separately.

### 2. Edge Act Jurisdiction

The Edge Act, 12 U.S.C. §§ 601 *et seq.,* provides federal district courts with an independent basis for exercising subject matter jurisdiction over certain purely state or common law actions involving international banking by designating such actions as "federal question" actions. The Act provides, in relevant part:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking ... or out of other international or foreign financial operations ... shall be deemed to *arise under the laws of the United States.*[11]

12 U.S.C. § 632 (*emphasis added* ).

■ For a district court to exercise Edge Act jurisdiction over a civil action, that action must meet two requirements: (1) a corporation organized under the laws of the United States is a party; and (2) the action arises out of transactions involving international or foreign banking or other financial operations. *See Papadopoulos v. Chase Manhattan Bank, N.A.,* 791 F.Supp. 72, 74 (S.D.N.Y.1990). Defendants contend that the present action does not satisfy either of these requirements. Thus, the Court shall address both.

### a. Corporation Organized Under the Laws of the United States as a Party to Action

■ For this Court to have Edge Act jurisdiction over the present action, at least one of the parties must be a corporation organized under the laws of the United States. Defendants do not dispute that

---

**11.** Federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

three of the four named Plaintiffs, BNA, BAOC, and BIFC are corporations organized under the laws of the United States (*see* Compl. ¶¶ 9—11), and, as discussed in Part II.B.5 *infra*, these three Plaintiffs have standing to assert a breach of contract claim against Defendants. Nevertheless, Defendants argue that the first prong of Edge Act jurisdiction is not met because the Edge Act Plaintiffs are not the "true parties in interest" with respect to the breach of contract claim since the indemnity and warranty provisions in the 1998 Stock Purchase Agreement which give them the right to sue for breach of contract "constitute a collusive joinder in an attempt to invoke federal jurisdiction," which, under 28 U.S.C. § 1359, is insufficient to establish subject matter jurisdiction. (Def. Mem. at 9).

■ Even assuming, arguendo, that a party's standing to sue does not automatically make him a "true party in interest," the Court finds Defendants "collusive joinder" argument unconvincing. While an assignment of claims by a parent corporation to its subsidiaries in an attempt to manufacture subject matter jurisdiction is presumptively improper under 28 U.S.C. § 1359, the record before the Court clearly shows that the indemnity and warranty provisions of the 1998 Stock Purchase Agreement are not such assignments. These provisions were drafted and executed over four years before this lawsuit was filed and before the events giving rise to the lawsuit even occurred, and Defendant Lemgruber himself agreed to them by signing the 1998 Stock Purchase Agreement. Moreover, such provisions are commonly used in stock purchase agreements. *See* American Bar Association, "Model Stock Purchase Agreement" § 10.2 (1995) (providing indemnification to buyer and its "affiliates"). In contrast, all of the "collusive joinder" cases cited by Defendants involved after-the-fact assignments of claims by corporate parents to subsidiaries

who otherwise would have had no legal claims. *See Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969) (assignment of claims under contract five years after execution of contract and on eve of lawsuit's commencement); *Prudential Oil Corp.*, 546 F.2d at 472–73 (assignment to subsidiary created solely for prosecution of parent's claim which arose prior to assignment); *Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857 (2d Cir.1995) (assignment made after commencement of lawsuit). Accordingly, the first requirement for Edge Act jurisdiction is satisfied.

b. Arising out of Transactions Involving International or Foreign Banking or Other Financial Operations

■■ "A suit satisfies the jurisdictional prerequisites of Section 632 if *any part of it* arises out of transactions involving international or foreign banking." *In re Lloyd's American Trust Fund Litig.*, 928 F.Supp. 333, 338 (S.D.N.Y.1996) (citing *Corporacion Venezolana de Fomento (CVF) v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir.1980), *cert denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981)) (*emphasis added* ). Indeed, federal courts in this Circuit have consistently interpreted the Edge Act's jurisdictional provision broadly, "routinely appl[ying] Section 632, even in cases based on state law causes of action and containing only an incidental connection to banking law," and "even though the international or foreign banking activity was not central to the case." *In re Lloyd's American*, 928 F.Supp. at 340 (collecting cases); *see also CVF*, 629 F.2d at 792 (Edge Act jurisdiction properly exercised over declaratory judgment action to nullify guarantee of promissory notes because already-dismissed defendant's holding the money raised through issuance of notes as letters of credit constituted foreign banking activity); *General Star Indemnity Co. v. Platinum Indemni-*

*ty Ltd.*, No. 00 Civ. 4960, 2001 WL 40763, at *2 (S.D.N.Y. Jan.17, 2001) (Edge Act jurisdiction properly exercised over declaratory judgment action involving reinsurance contract where defendant's rights under contract were assigned to co-defendant pursuant to an international banking transaction).

Defendants do not dispute that Plaintiffs' breach of contract claim arose out of an international transaction, but instead contend that the claim's connection to banking or other financial operations is too remote to satisfy even the broad jurisdictional grant of § 632.[12] Specifically, Defendants argue that in every one of the above-mentioned cases broadly interpreting § 632, the "very essence of at least one of the causes of action ... involved a classic example of a foreign or international banking transaction or financial operation," while Plaintiffs' breach of contract claim allegations "merely concern contractual purchases of stock and alleged fraud and breaches of warranties in connection therewith." (Def. Mem. at 10–12).

However, in distinguishing the present case from these other Edge Act cases, Defendants mischaracterize the nature of Plaintiffs' breach of contract claim. Plaintiffs are suing for breach of a stock purchase contract, an alleged breach which itself rendered the warranties concerning the BL Banks' financial condition and legal troubles untrue, concealed the falsity of the re-certified warranties from the Plaintiffs, and which was accomplished in part through overdrafts and inter-bank wire transfers of BL Bank funds into the United States, fraudulent loans, and purchases of bogus certificates of deposit (*see* Compl. ¶¶ 35–49), all of which are clearly foreign or international banking transactions. *See Nacional Financiera S.N.C. v. Chase Manhattan Bank, N.A.*, No. 00 Civ. 1571, 2001 WL 327159, at *3 (S.D.N.Y. Apr. 4, 2001) (noting that loans and payment and processing of drafts are typical banking activities); *Pinto v. Bank One Corp.*, No. 02 Civ. 8477, 2003 WL 21297300, at *3 (S.D.N.Y. June 4, 2003) (classifying the making of loans as a traditional banking activity); *Warter v. Boston Securities, S.A.*, No. 03–81026–CIV, 2004 WL 691787, at *7–8 (S.D.Fla. Mar.22, 2004) (holding that Edge Act jurisdiction existed "because the facts underlying Plaintiff's [tort] claims, wire transfers, managing deposits, and providing investment advice, constitute banking activities"). The facts underlying Plaintiffs' breach of contract claim are therefore analogous to *In re Lloyd's American*, 928 F.Supp. 333 (S.D.N.Y. 1996), in which Judge Sweet held that Edge Act jurisdiction existed over state law breach of contract and fiduciary duty claims against trustee of an insurance underwriter premium trust because the trustee allegedly committed the breaches while administering the trust, which necessarily involved international banking transactions. *Id.* at 341.[13]

Accordingly, because Plaintiffs' breach of contract claim satisfies both jurisdiction-

---

**12.** Defendants actually argue that all four of Plaintiffs' causes of action fail to satisfy the Edge Act's second jurisdictional prong; however, since only the breach of contract claim includes a corporation organized under the laws of the United States as a party, it is unnecessary for the Court to address the second jurisdictional prong with respect to these other claims.

**13.** Moreover, while the Edge Act itself does not explicitly define "other international or foreign financial operations," the statutory scheme makes clear that the term is intended to include transactions like the BL Bank stock acquisition. Section 615 of the Act provides that one of the powers granted to Edge Act corporations, which are organized specifically "for the purpose of engaging in ... international or foreign financial operations," 12 U.S.C. § 611, is the power "to purchase and hold stock or other certificates of ownership in any other corporation organized ... under the laws of any foreign country." 12 U.S.C.

al prerequisites of 12 U.S.C. § 632, this Court can properly exercise subject matter jurisdiction over that claim pursuant to the Edge Act.

### c. Supplemental Jurisdiction

While the Court only has original federal question jurisdiction over Plaintiffs' breach of contract cause of action, the Court can also exercise subject matter jurisdiction over BAC's fraudulent inducement claim [14] if the prerequisites for supplemental jurisdiction are met.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." This statute simply codifies the concept of pendant claim jurisdiction as set forth by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See Promisel v. First American Artificial Flowers*, 943 F.2d 251, 254 (2d Cir.1991) (noting that § 1367(a) codified the availability of pendant jurisdiction), cert. denied, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). In *Gibbs*, the Court reasoned that "if considered without re-

gard to their federal or state character a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." 383 U.S. at 725, 86 S.Ct. at 1138. The requisite link between the state and federal claims is "a common nucleus of operative fact." *Id.*

In addition to giving federal district courts the power to exercise supplemental subject matter jurisdiction over certain state law claims, § 1367 provides these courts the discretion to refuse in some circumstances to exercise such jurisdiction where it would otherwise be proper to do so. Specifically, § 1367(c) provides that:

> The district courts may decline to exercise supplemental jurisdiction over a claim in subsection (a) if-
>
> (1) the claim raises a novel or complex issue of state law,
>
> (2) the claim substantially predominates over the claim or claims which it has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).[15]

---

§ 615(c). In addition, the common meaning of "finance" is "to supply with funds through the issuance of stocks, bonds, notes or mortgages." Black's Law Dictionary 568 (5th ed.1979), *cited in Stamm v. Barclays Bank of New York*, 1996 WL 614087, at *2 n. 3; *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Thus, the BL Bank stock purchase, regardless of whether it involved any traditional banking activity, still satisfies the second requirement for Edge Act

jurisdiction as an "international financial operation." *See In re Lloyd's American*, 928 F.Supp. at 341 (holding that Edge Act jurisdiction may be premised upon foreign financial operations other than banking); *Stamm*, 1996 WL 614087, at *2 (same).

**14.** As discussed in detail in Part II.B. *infra*, all Plaintiffs' conversion and breach of fiduciary duty claims and the Edge Act Plaintiffs' fraudulent inducement claim are dismissed for lack of standing.

**15.** The *Gibbs* Court actually provided somewhat different factors for a district court to

■ This Court clearly has the power to exercise supplemental jurisdiction over BAC's fraudulent inducement claim. As demonstrated by the Court's refusal to dismiss Plaintiffs' breach of contract claim pursuant to Rules 9(b) and 12(b)(6), *see* Parts II.B.5 and C.1 *infra,* the Court considers this federal claim to be substantial. Moreover, the fraudulent inducement and breach of contract claims clearly share "a common nucleus of operative fact," namely Defendants' alleged embezzlement of BL Bank funds and subsequent failure to disclose this and other negative information regarding the BL Banks to Plaintiffs at the time of the 2000 and 2001 Stock Purchases. Finally, the Court may still exercise jurisdiction over the causes of action to which the Edge Act Plaintiffs, upon whom original federal question jurisdiction is based, are no longer parties. *See CVF,* 629 F.2d at 791–93 (finding jurisdiction over entire action where Edge Act jurisdiction lay with regard to a single claim against a single defendant who was subsequently dismissed from the case.)

At the same time, the Court sees no reason to refuse to exercise supplemental jurisdiction over BAC's fraudulent inducement claim. After all, neither of Plaintiffs' remaining claims, both familiar common law causes of action, raise novel or complex issues of state law. Moreover, the fraudulent inducement claim cannot be said to predominate over the breach of contract claim since it does not appear to raise any significant factual or legal issues not also raised by the breach of contract claim. Finally, the Court sees no other compelling reasons for declining supplemental jurisdiction. In fact, a compelling reason to exercise supplemental jurisdic-

tion is the prevention of inconsistent results that could occur if the fraudulent inducement claim is litigated in another forum which then resolves the factual and legal issues common to these claims differently than does this Court.

Accordingly, this Court shall exercise supplemental subject matter jurisdiction over BAC's fraudulent inducement claim.

### 3. Diversity Jurisdiction

Because the Court finds that it may properly exercise subject matter jurisdiction over Plaintiffs' remaining two claims pursuant to the Edge Act and 28 U.S.C. § 1367, it is not necessary for the Court to determine if it also has diversity jurisdiction over the present action.

### B. Standing

### 1. Dismissal for Lack of Standing

It is unclear whether dismissal for lack of standing is properly raised in a Rule 12(b)(1) or Rule 12(b)(6) motion. *See Rent Stabilization Ass'n of New York v. Dinkins,* 5 F.3d 591, 594 (2d Cir.1993) (noting that district courts in this circuit have dismissed for lack of standing under both Rule 12(b)(1) and Rule 12(b)(6)); *Thompson v. County of Franklin,* 15 F.3d 245, 247 (2d Cir.1994) (same). Regardless, a district court must "accept all material allegations of the complaint, and must construe the complaint in favor of the moving party." *Thompson,* 15 F.3d at 249 (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)).

■ However, as the Supreme Court has noted, the standing "inquiry involves

consider when deciding whether to exercise pendent jurisdiction, including judicial economy, convenience and fairness to litigants, and comity with state courts. 383 U.S. at 726, 86 S.Ct. at 1139. However, the Second Circuit has specifically held that § 1367(c) has al-

tered *Gibbs'* discretionary analysis, so that "discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of subsection 1367(c)." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 447–48 (2d Cir.1998).

both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise," *Warth,* 422 U.S. at 498, 95 S.Ct. at 2209, and is essentially "a jurisdictional prerequisite to a federal court's deliberations." *Hodel v. Irving,* 481 U.S. 704, 711, 107 S.Ct. 2076, 2080, 95 L.Ed.2d 668 (1987). Thus, standing, "like other jurisdictional inquiries, 'cannot be inferred argumentatively from averments in the pleadings, ... but rather must appear affirmatively in the record ...,'" so that, on a motion to dismiss, " 'it is the burden of the party [asserting standing to sue] ... clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Thompson,* 15 F.3d at 249 (quoting *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990)). Moreover, when analyzing a standing question under either Rule 12(b)(1) or 12(b)(6), " 'it is within the district court's power to allow ... the plaintiff to supply, by amendment to the complaint or affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.'" *Thompson,* 15 F.3d at 249 (quoting *Warth,* 422 U.S. at 518, 95 S.Ct. at 2215); *see also First Capital Asset Mgmt. v. Brickellbush, Inc.,* 218 F.Supp.2d 369, 377–78 (S.D.N.Y.2002) ("the district court is authorized to consider matters outside the pleadings and to make findings of fact when necessary.") (citing *Thompson* ), *aff'd,* 385 F.3d 159 (2d Cir.2004).

Defendants contend that the Edge Act Plaintiffs lack standing to assert claims for fraudulent inducement and breach of contract, and that all Plaintiffs lack standing to bring an action for conversion and breach of fiduciary duty. The Court will address the standing issues with respect to each claim separately.

### 2. Edge Act Plaintiffs' Standing to Sue for Fraudulent Inducement

 Under New York law,[16] a party has standing to bring a claim of fraudulent inducement when it can show "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 104 (2d Cir.2001) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803–04, 250 N.E.2d 214 (1969)). In addition, a fraudulent inducement claim also requires "a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.' " *Id.* at 104 (quoting *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986)). The United States Supreme Court, meanwhile, has held that where the causal link between the defendant's actions and the party claiming inju-

---

**16.** While the Edge Act confers federal question jurisdiction on district courts, federal law does not supply the substantive rule of decision in Edge Act cases. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, NA,* 731 F.2d 112, 121 (2d Cir.1984); *see also Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786 (2d Cir.1980) (applying federal common law choice of law rules but New York State and Venezuelan substantive law to claims and counterclaims in Edge Act case),

*cert denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). Moreover, because the parties have not asserted that any law other than New York's governs this action, the Court assumes that New York provides the substantive rule of decision as to all of Plaintiffs' causes of action. *Bross Utilities Service Corp. v. Aboubshait,* 618 F.Supp. 1442, 1445 n. 3 (S.D.N.Y.1985) (citations omitted); *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 19 n. 7 (S.D.N.Y. 1985) (citing *Aaron Ferer* ).

ry is too remote, the courts will usually find that standing is not present. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (holding indirectly-injured customers of directly-injured bankrupt securities brokers lacked standing to sue for stock manipulation under RICO).

█ In the present case, while Defendants do not dispute BAC's standing to assert fraudulent inducement, they argue that the Edge Act Plaintiffs lack standing because their involvement in the 2000 and 2001 stock acquisitions was too remote. Specifically, Defendants note that the Edge Act Plaintiffs were not parties to either the 2000 or 2001 Stock Purchase Agreements and that non-parties Brazil and Bahamas Holdings, not the Edge Act Plaintiffs, actually purchased the BL Bank stock. (Memorandum of Law in Support of the Lemgruber Defendants' Motion to Dismiss ["Def. Mem."] at 19; Memorandum of Law in Support of Floris' Defendants Motion to Dismiss ["Floris Def. Mem."][17] at 14, 19).

Plaintiffs, on the other hand, argue that even though the Edge Act Plaintiffs were not signatories to the Stock Purchase Agreements and were not the entities that actually acquired the BL Bank stock, they were induced by Defendants' alleged misrepresentations to approve BAC's exercise of its Call Option in 2000 and 2001 and to fund the 2000 and 2001 stock purchases through the $86.4 million in equity contributions they made to enable BL Brazil and Bahamas to purchase the BL Bank stock. (Pl. Mem. at 10; Danziger Decl. ¶¶ 11–12). In support of their argument, Plaintiffs cite to case law which they claim holds that, under New York law, indirect addressees of fraudulent representations who foreseeably rely on such representations have standing to sue for fraud, and they

contend that Defendants "must have known that BAC would use affiliated corporations such as [the Edge Act Plaintiffs] to approve and fund the 2000 and 2001 stock purchases just as it did in the first installment purchase in 1998." (Pl. Mem. at 10).

The Court agrees with Defendants. As an initial matter, Defendants are correct that the record before the Court on the present motion clearly establishes that the Edge Act Plaintiffs neither exercised the Call Option themselves nor actually purchased any BL Bank stock in 2000 or 2001. Although the Complaint generally alleges that BAC and the Edge Act Plaintiffs collectively exercised the Call Option in 2000 and 2001 and purchased the remaining 49% of the BL Banks' stock (Compl.¶¶ 31–32, 66), Plaintiffs' own opposition papers and the various stock purchase and shareholder agreements referenced in the Complaint clearly contradict such allegations. *See* Danziger Decl. ¶¶ 7–8; Weinberg–Brodt Decl., Exs. E (2000 Stock Purchase Agreement stating that BAC alone was exercising the Call Option), F and G (2001 BL Brazil and BL Bahamas Share Purchase Agreements identifying Brazil and Bahamas Holdings as the purchasers of the shares); *see also Matusovsky v. Merrill Lynch*, 186 F.Supp.2d 397, 400 (S.D.N.Y.2002) ("allegations . . . contradicted by . . . a document [referenced in the complaint] are insufficient to defeat a motion to dismiss"); *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F.Supp.2d 179, 184 (S.D.N.Y.2000) (granting motion to dismiss where "documents [referenced but not attached to complaint] contradict Plaintiffs' allegations.").

In addition, just because the Edge Act Plaintiffs are corporate affiliates of BAC, Brazil Holdings and Bahamas Holdings,

---

**17.** The Lemgruber Defendants have incorporated the Floris Defendants' Memorandum by reference into their motion to dismiss. *See* Footnote 10, *supra*.

the acts of these latter entities during the 2000 and 2001 stock acquisitions are not imputed to the Edge Act Plaintiffs for the purposes of standing. *See Carte Blanche v. Diners Club Int'l, Inc.,* 2 F.3d 24, 25 (2d Cir.1993) (holding that, under New York law, "a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that for both"); *Alexander & Alexander of New York, Inc. v. Fritzen,* 114 A.D.2d 814, 815, 495 N.Y.S.2d 386 (1st Dep't.1985), ("One corporation will generally not have legal standing to exercise the rights of other associated corporations."), *aff'd,* 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986).

Moreover, the Court is not persuaded by Plaintiffs "indirect addressee" argument. While it is true that a party need not be signatory to a contract to assert a claim sounding in fraudulent inducement arising out of that contract, *see Wechsler v. Hoffman–La Roche, Inc.,* 198 Misc. 540, 541, 99 N.Y.S.2d 588, 590 (N.Y.Sup.Ct.1950) (citations omitted); Restatement (Second) of Torts § 533 (1976), courts in this Circuit have consistently found "injuries that are wholly derivative of harm suffered by a third party" to be "too remote" to establish the proximate causation necessary for a plaintiff to have standing to sue in tort. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 236, 242 (2d Cir.1999) (holding that derivatively-injured plaintiffs lacked standing to sue for fraud under New York law), *cert. denied,* 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000); *see also Manson v. Stacescu,* 11 F.3d 1127, 1130–31 (2d Cir. 1993) (holding that plaintiff "does not have standing in his capacity as a creditor, shareholder, or employee of a corporation to assert a RICO claim for injuries that are derivative of those sustained by that corporation"), *cert. denied,* 513 U.S. 915, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994);

*Paris Partners, L.P., v. Russo,* No. 94 Civ. 5684, 1995 WL 746585, at *5 (S.D.N.Y. Dec.14, 1995) (holding plaintiff partnership which advanced money to its subsidiary to do business with third-party corporation that became insolvent due to defendants' fraud had suffered only a derivative injury and thus did not have standing to sue under RICO). Because "directly-injured victims can generally be counted on to vindicate the law," *Holmes,* 503 U.S. at 269, 112 S.Ct. at 1318, this "no derivative injury standing" rule "serves the interests of judicial economy by allowing courts to determine ... one damage award that will restore" both directly and indirectly-injured tort victims, *Manson,* 11 F.3d at 1132, and "obviates the risk of multiple recoveries" against one defendant for the same misconduct. *Holmes,* 503 U.S. at 269, 112 S.Ct. at 1318.

In the present case, the injury that the Edge Act Plaintiffs allegedly suffered as a result of Defendants' fraudulent inducement the loss of the $86.4 million in funding they provided to Brazil and Bahamas Holdings to complete the 2000 and 2001 stock purchases is clearly derivative of the losses Brazil and Bahamas Holdings themselves suffered in purchasing the BL Bank stock at allegedly artificially inflated prices (Am. Compl. ¶ 66; Danziger Decl. ¶ 11). The only reason the Edge Act Plaintiffs cannot realize a full return on their investment in Brazil and Bahamas Holdings is because the latter entities did not realize a full return on their investment in the BL Banks.

The Edge Act Plaintiffs are essentially in the same position as the plaintiffs in *Jackson Nat'l Life Insurance Co., v. Ligator,* 949 F.Supp. 200 (S.D.N.Y.1996). In *Jackson,* plaintiffs, who acquired $33.3 million of debt and equity in another corporation in order to finance that corporation and its subsidiary's purchase of business

entities controlled by the defendants, sued defendants for fraudulent misrepresentations and omissions that artificially inflated the value of the acquired entities. *Id.* at 201–02. Citing the long line of cases refusing to confer standing to sue on plaintiffs who have suffered derivative injuries, Judge Preska dismissed plaintiffs' claims for lack of standing, finding that plaintiffs' injuries were not "separate and distinct" from the direct injuries suffered by the corporation that plaintiffs had funded. *Id.* at 205–06. In addition, Judge Preska reasoned that, because the directly-injured corporation had already sought legal recourse through arbitration, plaintiffs could further the twin goals of judicial economy and the avoidance of double recovery if they simply awaited the outcome of the arbitration rather than continuing with their lawsuit. *Id.* at 204–05. Similarly, in the present case, BAC, the Edge Act Plaintiffs' corporate parent, can pursue the fraudulent inducement claim on their behalf, and Plaintiffs have also expressed a willingness to join Brasil and Bahamas Holdings as plaintiffs to this claim. (*See* Pl. Mem. at 19 n. 11). The Court therefore sees no reason to treat the Edge Act Plaintiffs any differently than the plaintiffs in *Jackson.*

Meanwhile, the two "indirect addressee" cases cited by Plaintiffs are of no help to them. While each case held that a specific indirect addressee of a fraudulent misrepresentation had standing to sue in fraud, the injuries suffered by the plaintiffs in these cases were separate and distinct from, rather than derivative of, any fraud committed against the direct addressees. *See Wechsler,* 198 Misc. at 541–42, 99 N.Y.S.2d 588 (plaintiff's spouse died after taking drug manufactured by defendant who had fraudulently concealed "fatal propensities" of drug from deceased spouse's physician who had prescribed it to her); *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 794 F.2d 763, 764–65 (2d Cir.

1986) (plaintiff was actual purchaser of movie distribution rights originally owned by defendants and had purchased such rights in reliance upon misrepresentations made by defendants to middleman). *Wechsler* and *Ostano* are therefore inapposite and provide no grounds for exempting the Edge Act Plaintiffs from the general rule in this Circuit against standing based on derivative injuries.

Finally, the Court finds it necessary to address the rather vague allegation in Plaintiffs' Complaint that BAC and its affiliates' "possessory interests acquired through the 1998 Stock Acquisition, the 2000 Stock Acquisition, and the 2001 Stock Acquisition are held by [the Edge Act Plaintiffs]." (Compl.¶ 33). As discussed above, the record before the Court on the present motion clearly establishes that Brazil and Bahamas Holdings acquired and currently own 100% of the BL Banks' stock. (Danziger Decl. ¶¶ 7–8; Weinberg–Brodt Decl., Exs. C, D, and F). However, even to the extent Plaintiffs are suggesting that BAC, Brazil Holdings and Bahamas Holdings have assigned their fraudulent inducement claims against Defendants to the Edge Act Plaintiffs, this single vague allegation is insufficient to confer standing on the latter. *See Electronics Communications Corp. v. Toshiba,* 129 F.3d 240, 243 (2d Cir.1997) (Holding that conclusory statements in a complaint will not substitute for sufficient factual allegations when trying to overcome a motion to dismiss).

Moreover, because participation of the Edge Act Plaintiffs is necessary to establish the Court's Edge Act jurisdiction over this case, such assignment between corporate affiliates, even if it has in fact taken place, must be treated under 28 U.S.C. § 1359 as a "presumptively improper" attempt to manufacture federal subject matter jurisdiction, and the Edge Act Plaintiffs therefore "must bear a heavy burden

of proof" that the "assignment was made for legitimate commercial reasons independent of the desire to litigate in federal court ..." *Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 476 (2d Cir. 1976). Since Plaintiffs have not offered any details on the assignment of the fraudulent inducement claim which would tend to show that it was made for reasons other than establishing Edge Act jurisdiction over the present dispute, the Court refuses to find that such claim has been properly assigned to the Edge Act Plaintiffs.

Accordingly, the Edge Act Plaintiffs do not have standing to sue Defendants for fraudulent inducement.

### 3. All Plaintiffs' Standing to Sue for Conversion

Defendants also argue that none of the Plaintiffs have standing to bring a conversion claim based on Defendant Lemgruber's alleged embezzlement of BL Banks' funds. Specifically, Defendants maintain that the allegations in Plaintiffs' Complaint establish that, as a matter of law, only the non-party BL banks themselves have legal standing to sue for the alleged conversion because there are no allegations that any of the Plaintiffs "had 'ownership, possession or control' of the diverted funds preceding the conversion." (Def. Mem. at 15–17). In response, Plaintiffs, while apparently conceding that the Edge Act Plaintiffs lack standing to sue for conversion, argue that the Complaint sufficiently alleges that Plaintiff BAC has "a legal right and superior right of possession" to the converted BL Bank assets and that the BL Banks' shareholder and management agreements clearly establish that Plaintiff BAC had control over the converted assets prior to the conversion. (Pl. Mem. at 12–13).

Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 884, 452 N.Y.S.2d 599, 600 (1st Dep't 1982) (citing *Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105, 156 N.E. 629 (1927)). "An action for conversion can be maintained only by the true owner of the property." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 50 (2d Cir.1996) (citing *Aetna Casualty & Surety Co. v. Glass*, 75 A.D.2d 786, 428 N.Y.S.2d 246, 247 (1st Dep't 1980) (requiring plaintiff to demonstrate that it had "legal ownership or an immediate superior right of possession to specific identifiable personal property" in order to show a conversion)). Thus, while New York law permits an action for conversion of a specifically identifiable sum of money, *see Peters Griffin Woodward*, 88 A.D.2d at 883, 452 N.Y.S.2d at 600, a plaintiff asserting such claim must allege that he had "ownership, possession, or control of the money before its conversion." *ESI, Inc. v. Coastal Power Production, Co.*, 995 F.Supp. 419, 433 (S.D.N.Y.1998) (citing *Peters Griffin Woodward*); *Aramony v. United Way*, 949 F.Supp. 1080, 1086 (S.D.N.Y.1996) (same). Moreover, "[t]he law presumes that ownership lies with the person in possession of the property or money." *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F.Supp.2d 133, 150 (S.D.N.Y.2000) (citing *Northern Pacific R.R. Co. v. Lewis*, 162 U.S. 366, 372, 16 S.Ct. 831, 40 L.Ed. 1002 (1896)).

Nowhere in their Complaint do Plaintiffs sufficiently allege that they had ownership, possession, or control of the BL Bank funds before the alleged conversion. The Complaint describes the $38 million of supposedly converted funds as assets of the BL Banks and specifically alleges that Defendants overdrew from accounts in the possession and control of BL

Bahamas (Compl.¶¶ 37, 49). Meanwhile, Plaintiffs' conclusory allegation that they have "a legal right and an immediate superior right of possession to assets currently being held by Defendant Lembgruber" (*Id.* ¶ 88) is, without more, insufficient to survive a motion to dismiss. *See Electronics Communications Corp.*, 129 F.3d at 243 (stating that conclusory statements cannot substitute for "minimally sufficient factual allegations" on a motion to dismiss).

Moreover, as discussed in Part II.B.2 *supra*, the fact that Plaintiffs had equity interests in and/or were corporate affiliates of the BL Banks at the time of the alleged conversion (*see* Compl. ¶¶ 8–11; Danziger Decl. ¶¶ 1–8, Ex. A) does not give them ownership rights in the BL Bank funds or otherwise confer upon them standing to sue Defendants for conversion. *See United States v. Wallach*, 935 F.2d 445, 462 (2d Cir.1991) ("[S]hareholders do not hold legal title to any of the corporation's assets. Instead, the corporation the entity itself is vested with the title."); *Alexander & Alexander of New York Inc.*, 114 A.D.2d 814, 815, 495 N.Y.S.2d 386, 388 (1st Dep't 1985) ("[O]ne corporation will generally not have legal standing to exercise the rights of other associated corporations."), *aff'd*, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986); *Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985) ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually."). Indeed, it has long been the law of the New York and this Circuit that a corporation cannot pierce the corporate veil it created for its own protection whenever doing so would be to its benefit. *See, e.g., Colin v. Altman*, 39 A.D.2d 200, 202, 333 N.Y.S.2d 432, 433 (1st Dep't 1972) ("The corporate veil is never pierced for the benefit of the corporation or its stockholders"); *Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676 (2d Cir.1979) ("[W]e will not here 'pierce the corporate veil' in favor of those who created that veil."); *Bross Utils. Serv. Corp. v. Aboubshait*, 618 F.Supp. 1442, 1445 (S.D.N.Y.1985) ("[C]ourts will not allow a parent to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary.") (citations omitted).

Finally, Plaintiffs' reliance on the BL Bank Shareholder and Management Agreements as proof of Plaintiff BAC's "control" over the BL Bank Assets at the time of the alleged conversion is misplaced for several reasons. First, BAC's contractual right under the BL Bank Management Agreements to appoint and terminate various BL Bank officers (*see* Pl. Mem. at 12; Goldstein Decl. Exs. A, C and D) does not give BAC control over the BL Banks' assets as well. In addition, BAC's right under the Floris BL Bank Management Agreement to veto certain "Special Transactions" involving the BL Banks (*see* Goldstein Decl. Ex. A Cl. IIa, Ex. B Cl. a [18]) is analogous to a shareholder's right to vote on certain "fundamental matters" of the corporation in which he owns shares;

---

**18.** Plaintiff also cites to the "Special Transaction" veto and "Risk Manager and Controller" appointment provisions in §§ 1.8(b)(i) and (iv) of the BL Brazil and Bahamas Shareholder Agreements. (*See* Pl. Mem. at 12–13 n. 8 and 9). However, these provisions specify that the rights extend only to Brazil and Bahamas Holdings, which were the only Bank of America affiliates to be parties to these agreements (*see* Weinberg–Brodt Decl., Exs. C and D), and, as discussed at length above, such rights cannot be imputed to BAC, which is located several rungs up the corporate ownership ladder. *See Carte Blanche*, 2 F.3d at 25 ("a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that for both").

and yet, as discussed above, shareholders still cannot sue for the conversion of their corporation's assets.

Accordingly, the Court finds that all Plaintiffs lack standing to sue Defendants for conversion of the BL Banks' assets.[19]

### 4. All Plaintiffs' Standing to Sue for Breach of Fiduciary Duty

Defendants also contest all Plaintiffs' standing to assert their breach of fiduciary claim, arguing that Lemgruber, as manager of the BL Banks, owed a fiduciary duty only to the BL Banks and that, in any event, a breach of fiduciary duty claim arising out of alleged mismanagement or diversion of BL Bank funds can only be brought by BL Banks themselves or in a derivative suit on their behalf. (Def. Mem. at 15–17).

■■■■ Under New York law, "[a] fiduciary relation exists between two persons when one of them is under a duty to act or to give advice for the benefit of the other upon matters within the scope of the relation." *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (quoting Restatement (Second) of Torts § 874, cmt. a). While "any inquiry into whether such obligation exists is necessarily fact-specific to the particular case," courts "will look to whether a party reposed confidence in another and reasonably relied on another's superior expertise or knowledge." *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8, 14 (1st Dep't 1998) (citations omitted). Such a duty can sometimes arise out of a contractual relationship. *See Mandelblatt*, 521 N.Y.S.2d at 676 ("It is well-settled that the same conduct which may constitute the breach of contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." (citations omitted)); *GLM Corporation v. Klein*, 665 F.Supp. 283, 286 (S.D.N.Y.1987) ("If a contract establishes a relationship of trust and confidence between the parties, ... then a fiduciary duty arises from the contract which is independent of the contractual obligation.").

■■■■ A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority, and any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively on its behalf. *See, e.g., Abrams v. Donati*, 66 N.Y.2d at 953, 498 N.Y.S.2d at 783, 489 N.E.2d 751 ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may derivatively sue but not individually."); *Glenn v. Hoteltron Sys., Inc.*, 74 N.Y.2d 386, 392, 547 N.Y.S.2d 816, 818–19, 547 N.E.2d 71 (1989) (holding that shareholder could not individually bring breach of fiduciary duty cause of action arising out of diversion of corporation's assets by a corporate fiduciary); *Koal Indus. v. Asland, S.A.*, 808 F.Supp. 1143, 1163 (S.D.N.Y. 1992) ("Because fiduciary duties generally are said to be owed to a corporation and not to a particular stockholder, the enforcement of such duties must be in the name of the corporation.") (citations omitted). However, if a corporate fiduciary owes a separate duty to a corporation's parent, shareholder or other equity interest holder independent of the duty owed to

---

**19.** The Court also notes that if Plaintiffs choose to join Brazil and Bahamas Holdings as plaintiffs in this lawsuit pursuant to F.R.C.P. 20(a), *see* Part II.D. *infra,* Brazil and Bahamas Holdings will for identical reasons also lack standing to bring a conversion claim.

the corporation itself, that latter person may sue for injuries to the corporation caused by the breach of this separate fiduciary duty. *See Abrams,* 66 N.Y.2d at 953, 498 N.Y.S.2d at 783, 489 N.E.2d 751 ("Exceptions to that rule have been recognized when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged.") (citing cases); *Qantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1367 (S.D.N.Y.1991) (plaintiff could bring breach of fiduciary duty claim against president of its indirect subsidiary resulting from decline in value of indirect subsidiary's stock where defendant president also owed separate fiduciary duty to plaintiff) (citing cases).

■ In the present case, the alleged misconduct Lemgruber's embezzlement of the assets of the BL Banks injured the corporate entities to whom he owed a fiduciary duty as a director and officer.[20] Thus, the Edge Act Plaintiffs, as corporate grandparents of the BL Banks, may only sue for this wrongdoing if they can show that Lemgruber owed them a fiduciary duty separate from the one he owed to the BL Banks. Yet, Plaintiffs' Complaint nowhere alleges that Lemgruber owed such a separate fiduciary duty to the Edge Act Plaintiffs. Moreover, Plaintiffs are not suing derivatively on behalf of the BL Banks. Thus, the Edge Act Plaintiffs clearly lack standing to bring a breach of fiduciary duty claim against Lemgruber.[21]

Similarly, the injury purportedly suffered by BAC as a result of Lemgruber's alleged misconduct financial loss caused by diminution in the value of its investment in the BL Banks—is merely derivative of the injuries suffered by the BL Banks themselves. *See Abrams v. Donati,* 66 N.Y.2d at 953, 498 N.Y.S.2d 782, 489 N.E.2d 751 ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment ..."); *Glenn v. Hoteltron Sys.,* 74 N.Y.2d at 392, 547 N.Y.S.2d 816, 547 N.E.2d 71 (holding that injury suffered by shareholder of corporation whose assets were diverted by corporate officer was "real, but it was derivative, not direct."). Plaintiffs in turn argue that Lemgruber owed BAC a separate fiduciary duty by virtue of his 1998 Management Agreement with BAC. (Pl. Mem. at 11–12). However, nothing in the rather generalized language of the Management Agreement, which simply provides that Lemgruber "agrees to perform all duties required of him in holding [the] positions [of director and officer of each of the BL Banks]" (Goldstein Decl., Ex. D Cl. I), indicates that Lemgruber or BAC intended that Lemgruber would owe a fiduciary duty to BAC separate and apart from the one he owed the BL Banks. Accordingly, BAC also lacks standing to sue for breach of fiduciary duty.

### 5. Edge Act Plaintiffs' Standing to Sue for Breach of Contract

Defendants argue that the Edge Act Plaintiffs lack standing to bring their breach of contract claim because it arises out of alleged breaches of "various warranties in connection with the 2000 and 2001 Purchase Agreements," neither of which included the Edge Act Plaintiffs as parties. (Def. Mem. at 19; Def. Reply at 2–4). Plaintiffs, meanwhile, contend that Defendants actually breached warranties contained in the 1998 Stock Purchase Agreement and that, as named beneficiaries of such warranties and of the indemnification

---

**20.** Under his January 23, 1998 Management Agreement, Lemgruber was appointed a "director and officer" of both BL Banks. (*See* Goldstein Decl., Ex. D. Cl. I).

**21.** The Court also notes that Brazil and Bahamas Holdings would, for the same reasons, lack standing to sue individually for breach of fiduciary duty.

provision in the 1998 Agreement, the Edge Act Plaintiffs have the right under New York law to enforce these provisions. (Pl. Mem. at 7–8; Plaintiffs' Opposition to Floris Defendants' Motion to Dismiss [Pl. Floris Opp.] at 8–10).

■■■ New York law clearly permits a named but non-signatory beneficiary of a contract to sue for breach of that contract. *See, e.g., Arthur G. McKee & Co.,* 158 A.D.2d 969, 970, 551 N.Y.S.2d 720, 722 (4th Dep't 1990) (named non-party indemnitee of contract could sue for economic loss caused by breach of that contract); *Vogel v. Blade Contracting Inc.,* 293 A.D.2d 376, 377, 740 N.Y.S.2d 209, 210 (1st Dep't 2002) (same). In addition, neither side disputes that (1) BAOC is a named beneficiary of the warranties in Section 3 of the 1998 Stock Purchase Agreement, and that (2) all the Edge Act Plaintiffs are named indemnities under Section 10.2 of the Agreement. (Weinberg–Brodt Decl., Ex. B at 8, 19, 52–53). However, it is equally clear that the Edge Act Plaintiffs are neither parties to nor named beneficiaries of the 2000 and 2001 Stock Purchase Agreements. (*See* Weinberg–Brodt Decl., Ex. E (2000 Stock Purchase Agreement), Ex. F (2001 BL Bahamas Stock Purchase Agreement)). Thus the issue is whether the warranty and/or indemnity provisions of the 1998 Agreement cover Defendants' alleged misconduct, all of which occurred after the closing of the 1998 Stock Purchase.

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use," and thus the court "ordinarily looks only at the wording used by the drafters who presumably understood what they intended." *Seiden Assoc.'s, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 426, 428 (2d Cir.1992) (citing *Slatt v. Slatt,* 64 N.Y.2d 966, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)).

However, "when the language of a contract is ambiguous, its construction presents a question of fact," which of course precludes summary dismissal. *Jackson Heights Medical Group, P.C., v. Complex Corp.,* 222 A.D.2d 409, 411, 634 N.Y.S.2d 721, 722 (2d Dep't 1995) (citations omitted); *see also Seiden Assoc.'s,* 959 F.2d at 428 ("Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact . . .").

Ambiguous language is "that which is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Seiden Assoc.'s,* 959 F.2d at 428 (quoting *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir. 1987)). Conversely, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations," or "where one party's view 'strains the contract language beyond its reasonable and ordinary meaning.' " *Id.* (quoting *Bethlehem Steel Co. v. Turner Construction Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)).

■■■ Moreover, when interpreting contractual provisions which create a duty to indemnify where one would not otherwise exist, New York courts read indemnification language narrowly. As the New York Court of Appeals has declared,

"Words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit of a larger sense, yet they should be restrained to the particular

occasion and to the particular object which the parties had in view ... This is particularly true with indemnity contracts. When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed ... The promise should not be found unless it can be clearly implied *492 from the language and purpose of the entire agreement and the surrounding facts and circumstances."

*Hooper Assoc.'s, Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491–92, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989) (citations omitted); *see also Haynes v. Kleinewefers and Lembo Corp.,* 921 F.2d 453, 458 (2d Cir.1990) ("catch-all phrase," contained in a Sales Agreement and providing for assumption of "other obligations and liabilities arising in the ordinary course of business," failed to establish clearly an unmistakable intent to assume an obligation to indemnify for personal injuries suffered by a third party).

 Section 10.2 of the 1998 Stock Purchase Agreement provides that each of the Sellers, including Defendant Lemgruber, will indemnify, BAC, BAOC, and their "affiliates" (which include BIFC and BNA) for "any loss, liability, claim, damage ..., expense ..., or diminution of value ... arising, directly or indirectly, from or in connection with: (a) *any Breach of any representation or warranty made by the Sellers... in this Agreement, ... or any other certificate or document delivered by the Sellers ... pursuant to this Agreement."* (Weinberg–Brodt Decl., Ex. B at 52–53) *(emphasis added ).*

One could reasonably read this provision as applicable to Lemgruber's allegedly false 2001 re-certification of most of the warranties contained in section 3 of the 1998 Agreement, since such certification was made in connection with BAC's 2001

exercising its call option under § 11.2 of the 1998 Agreement to purchase the remaining 30% of the BL Bank shares. (Compl. ¶¶ 60–61; Weinberg–Brodt Decl., Ex. B at 60). The 1998 Agreement contemplated events beyond the 1998 Closing. (*See* Weinberg–Brodt Decl., Ex. B §§ 10.4(a), 10.8, 10.9, 11.1. 11.2, *et seq.*). Further, by referencing the 1998 Agreement in the re-certification of April 6, 2001, the Defendants incorporated the referenced sections. (*See* Weinberg–Brodt Decl., Ex. H).

Defendants, meanwhile, argue that BAC was obviously aware that the warranty and indemnity provisions of the 1998 Agreement did not apply to post–1998 conduct since it required Lemgruber and the other sellers to re-certify certain warranties in the 1998 Agreement in connection with the execution of the 2001 Purchase Agreement. (Def. Reply at 3). However, the nature of the re-certified warranties required re-certification to be the basis of action after 1998; no one would rely on the 1998 financial condition of a company in determining whether to invest in it further in 2001.

Defendants also argue that the warranties re-certified during the 2001 Stock Purchase did not run to any of the Edge Act Plaintiffs because Floris, De Luca and Lemgruber, in their 2001 re-certifications, did not re-certify the opening clause of Section 3 of the 1998 Stock Purchase Agreement, which provides that all the warranties contained in §§ 3.1–3.26 are made to BAC and BAOC. (Def. Reply at 3–4; Weinberg–Brodt Decl., Ex. B. at 19). Defendants' characterization of the opening paragraph of the Section 3 of the 1998 Agreement as a warranty strains the term "warranty" beyond its reasonable and ordinary meaning. A "warranty" is commonly defined as "a promise that a proposition of fact is true," Black's Law

Dictionary 1586 (6th ed.1990), and each of the warranties listed in §§ 3.1–3.26 of the 1998 Agreement constitute promises that various representations of fact concerning the financial condition and liabilities of the BL Banks and certain aspects of the 1998 Stock Purchase were true. (Weinberg–Brodt Decl., Ex. B at 19–42). In contrast, the introductory clause of § 3 simply states to whom these promises were being made, namely BAC and BAOC. Thus, this clause was clearly not a warranty requiring re-certification for it to continue to have effect. Thus, the Court finds that, as a matter of law, the § 3 warranties re-certified in 2001 continued to run to the same parties as they did in 1998.

### C. Pleading Justifiable Reliance

Defendants also move to dismiss BAC's fraudulent inducement claim and BAC's and the Edge Act Plaintiffs' breach of contract claim pursuant to Rules 12(b)(6) and 9(b) for failure to plead the justifiable reliance element of each claim adequately. (Def Mem. at 19–23). When considering a motion to dismiss under Rule 12(b)(6), a district court must read the complaint generously, accepting as true the factual allegations in the complaint and making all reasonable inferences in favor of the plaintiff. *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) (citations omitted); *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). A court should grant dismissal only if, after viewing plaintiff's allegations in this most favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992), *cert. denied*, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d

80 (1957)), *cert denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). However, because a 12(b)(6) motion is used to assess the legal feasibility of a complaint, the court should not "assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984). Rather, the Court must limit its consideration to the facts that appear on the face of the Complaint. *Id.*

■ Moreover, while a court considering a Rule 12(b)(6) motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See Paulemon v. Tobin*, 30 F.3d 307, 308–309 (2d Cir.1994); *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir.2004). Courts may also consider "documents either in plaintiff's possession or of which plaintiff [ ] had knowledge and relied on in bringing suit." *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *see also Cortec Indus., Inc.*, 949 F.2d at 42, 48 (2d Cir.1991) (finding that when resolving a motion to dismiss, courts may consider documents that plaintiff had actual notice of and which were integral to plaintiffs claim even through those documents were not referred to in the complaint).

Because the pleading requirements of fraudulent inducement and breach of contract differ greatly from one another with respect to the element of reliance, the Court shall address each claim separately.

### 1. All Plaintiffs' Breach of Contract Claim

■ As discussed at length above, BAC and the Edge Act Plaintiffs' breach of contract claims actually arise out of Defendants' alleged breach of certain war-

ranties contained in the 1998 Stock Purchase Agreement and re-certified by Defendants at the time of the 2001 Stock Purchase. Under New York law, it is not reliance on the truth of the warranted information but reliance only on the existence of the warranty as part of the sales contract that is necessary to establish a breach of express warranty claim. As the New York Court of Appeals declared in *CBS, Inc. v. Ziff–Davis Publishing Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990):

> "The critical question is not whether the buyer believed in the truth of the warranted information ..., but whether [buyer] believed [it] was purchasing the [seller's] promise [as to its truth] ... Once the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached."

75 N.Y.2d at 503–04, 554 N.Y.S.2d at 452–53, 553 N.E.2d 997.

The Second Circuit has qualified the *Ziff–Davis* "no reliance requirement" rule, holding that "where a buyer closes on a contract in full knowledge and acceptance of the facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach." *Galli v. Metz,* 973 F.2d 145, 151 (2d Cir.1992). Importantly, however, the *Galli* court explicitly limited its ruling to situations in which the selling party to a sales contract itself informs the buyer of the falsity of the warranties, specifying that where the falsity was "common knowledge" or revealed to the buyer by a third party, the *Ziff–Davis* rule remained in effect. *Id.; see also Rogath v. Siebenmann,*

129 F.3d 261, 264–65 (2d Cir.1997) ("[I]f the seller is not the source of the buyer's knowledge, e.g., if it is merely 'common knowledge' that the facts warranted are false, or the buyer has been informed of the falsity of the facts by some third party, the buyer may prevail in his claim for breach of warranty.").

█ In the present case, Defendants do not dispute that Plaintiffs believed the warranties regarding the BL Banks' financial condition and related matters were in fact part of both the 1998 and 2001 Stock Purchase Agreements. After all, the warranties were written into the 1998 Agreement signed by BAC and were re-certified in writing by Defendants in connection with the 2001 Stock Purchase. (*See* Compl. ¶¶ 57, 60–61; Weinberg–Brodt Decl., Ex. B at 19–42, Ex. H). Instead, Defendants contend that Plaintiffs' reliance on Defendants' certifications of the truth of the warranties at the time of the 2001 Stock Purchase was not justified because Plaintiffs had "on-site, day-to-day access to all of the books, records and information concerning BL Bahamas." (Def Mem. at 20–22). Yet, Defendants are essentially arguing that the truth about the BL Banks was "common knowledge", and neither Defendants nor the record before the Court on the present motion in any way suggests that Defendants themselves revealed to Plaintiffs before completion of the 2001 Stock Purchase that the warranties were no longer true. Thus, the *Galli* exception to the *Ziff–Davis* rule does not apply here, and under *Ziff–Davis,* Plaintiffs have clearly met the pleading requirements for the reliance element of their breach of warranty claim.

Accordingly, Rule 12(b)(6) dismissal of Plaintiffs' breach of contract claim for failure to plead justifiable reliance is not warranted.

230

### 2. BAC's Fraudulent Inducement Claim

▮▮▮▮ To state a cause of action for fraud under New York law, a plaintiff must sufficiently plead (1) a misrepresentation or a material omission of material fact which was false and known by defendant to be false, (2) was made for the purpose of inducing the plaintiff to rely on it, and (3) was justifiably relied upon by the plaintiff (4) who then suffered an injury as result of such reliance. *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996) (citations omitted). As " 'an essential element of a cause of action for fraud, ... [justifiable] reliance must be pleaded with particularity' pursuant to [Federal Rule of Civil Procedure] 9(b)." *Lutin v. New Jersey Steel Corp.*, No. 93 Civ. 6612, 1996 WL 636037, at * 7 (S.D.N.Y. Nov.1, 1996) (quoting *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir.1987)); *see also Manning v. Utilities Mutual Ins. Co.*, 254 F.3d 387, 400–01 (2d Cir.2001) (affirming district court's dismissal of New York fraud claim for failure to plead reasonable reliance with sufficient particularity as required by Rule 9(b)). Moreover, although reasonable reliance is a fact-specific inquiry "generally considered inappropriate for determination on a motion to dismiss," *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311, at *10 (S.D.N.Y. Aug.3, 1999) (citing cases), "whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss" in certain circumstances. *Granite Partners, L.P. v. Bear Stearns & Co.*, 58 F.Supp.2d 228, 259 (S.D.N.Y.1999); *see also Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032–33 (2d Cir.1993) (dismissing fraud claim prior to discovery for failure to plead justifiable reliance).

▮▮▮▮ In evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider, for example, the sophistication and expertise of the plaintiff in financial matters, the existence of a fiduciary relationship, access to the relevant information, concealment of the fraud, and the opportunity to detect the fraud. *Brown*, 991 F.2d at 1032 (citations omitted). New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the businesses they are acquiring. *See Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737 (2d Cir.1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."); *Abrahami v. UPC Construction Co., Inc.*, 224 A.D.2d 231, 234, 638 N.Y.S.2d 11, 14 (1st Dep't 1996) ("Plaintiffs, who are all sophisticated businessmen, had a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they were assuming") (citations omitted). Moreover, "[a] heightened degree of diligence is required where the victim of the fraud had hints of its falsity." *Banque Franco–Hellenique de Commerce Int'l et Maritime v. Christophides*, 106 F.3d 22, 27 (2d Cir.1997); *see also Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir.1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy.").

▮▮▮ On the other hand, "[w]hen matters are held to be peculiarly within defendant's knowledge, it is said plaintiff may rely without prosecuting an investigation,

as he has no independent means for ascertaining the truth." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir.1997) (quoting *Mallis v. Bankers Trust* Co., 615 F.2d 68, 80 (2d Cir.1980)), *cert. denied*, 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *see also Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964) (plaintiff justifiably relied on misrepresentations of facts "peculiarly within the knowledge of defendants" even though plaintiffs could have ascertained the truth through inspection of public records), *aff'd*, 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861 (1965).[22]

■ In the present case, Defendants correctly point out that Plaintiff BAC is a sophisticated investor, had unfettered access to all of the books and records of BL Bahamas prior to the 2000 and 2001 Stock Purchases, and must have known of the Brazilian Central Bank's fraud investiga-

tions of Defendants and other BL Bank affiliates, investigations which should have put BAC on notice that Defendant Lemgruber's representations regarding the BL Banks might be false. (Def. Mem. at 21–22; Def. Reply at 8–9). However, Defendants overlook that Plaintiffs' Complaint specifically alleges that a major part of Defendants' fraudulent scheme involved Defendant Lemgruber's execution of a series of "sham covering transactions" which offset his alleged overdrafts of BL Bank funds by creating fictitious assets on BL Bahamas' financial statements prior to the 2001 Stock Purchase. (Compl.¶¶ 42–49). The truth about BL Bahamas' financial situation at the time of the 2001 Stock Purchase was therefore "peculiarly within the knowledge of" Defendants so that BAC could not have discovered it by simply conducting a due diligence review of BL Bahamas documents, and thus the cases cited by Defendants where reliance was found to be unjustified are inapposite.[23]

---

**22.** Plaintiffs, in their opposition to the present motion, cite New York state and federal cases supporting the proposition that a plaintiff's negligent reliance is "not a defense to intentional fraud." (Pl. Mem. at 21–22). However, "the bulk of New York authority" still follows the above-mentioned "two-tiered standard" regarding a plaintiff's duty to investigate, which is based on "whether misrepresentations relate to matters that are, or are not, 'peculiarly within the defending party's knowledge.'" *Mallis*, 615 F.2d at 80. Moreover, Restatement (Second) of Torts § 545A upon which Plaintiffs also rely (*see* Pl. Mem. at 22 n. 14) merely states that "[o]ne who justifiably relies upon a fraudulent misrepresentation is not barred from recovery by his contributory negligence in doing so," and thus only begs the question of what constitutes justifiable reliance.

**23.** *See Grumman*, 748 F.2d at 738 (testing results that plaintiff could have but failed to review would have revealed falsity of defendant's representations about one of its products); *Brown*, 991 F.2d at 1032–33 (offering materials sent to plaintiffs revealed the falsity of defendants' oral misrepresentations about the "low risk" of the investments plaintiffs

were induced to purchase); *Schlaifer Nance & Company v. Estate of Andy Warhol*, 119 F.3d 91, 99 (2d Cir.1997) (Defendant's documents, which plaintiff was encouraged to but did not review before signing art licensing agreement with defendant, would have revealed true extent of defendant's copyrights over artwork at issue); *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette*, 919 F.Supp. 149, 151–52 (S.D.N.Y.1996) (Plaintiff did not review any of the SEC filings which contained potentially relevant information about the securities it was allegedly fraudulently induced into purchasing); *Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 632 (S.D.N.Y.1999) (documents that plaintiff could have but did not review provided more accurate financial information on the business venture he was induced to enter than did the three-month old letter on which he relied); *Granite Partners*, 58 F.Supp.2d at 260 (written evaluations of plaintiff's securities holdings which plaintiffs' investment advisors were under a duty but failed to produce would have revealed falsity of defendants' valuations of such securities).

Accordingly, because BAC has specifically alleged how and why its reliance on Lemgruber's representations made in connection with the 2000 and 2001 Stock Purchases was justifiable, BAC has sufficiently pleaded the justifiable reliance element of its fraudulent inducement claim.

### D. Failure to Join Additional Plaintiffs

Defendants also argue that the present case must be dismissed pursuant to F.R.C.P. 12(b)(7) because Plaintiffs have failed to join as additional plaintiffs Brasil and Bahamas Holdings and the BL Banks, all of whom, Defendants contend, are "necessary" and "indispensable" parties under F.R.C.P. 19. (Def. Mem. at 23; Floris Def. Mem. at 8–11). However, Rule 12(b)(7) dismissal is not appropriate when the absent party or parties can be joined. *See Schonfeld v. Raftery*, 335 F.Supp. 846, 852 (S.D.N.Y.1971) ("Where . . . the court can order that [the absent party] be joined, there is no need shown for dismissal under Rule 12(b)(7)."); *World Omni Financial Corp. v. Ace Capital Re, Inc.*, No. 02 Civ. 476, 2002 WL 31016669, at *2 (S.D.N.Y. Sep. 10, 2002) (denying defendant's Rule 12(b)(7) motion to dismiss and granting plaintiff's motion to amend complaint to join necessary party). Thus, because Defendants' argument for why joinder of the BL Banks and Brasil and Bahamas Holdings is infeasible the destruction of diversity is no longer relevant given the Court's Edge Act jurisdiction over the present case, Rule 12(b)(7) dismissal is not warranted.

Nevertheless, the question remains whether these entities must be joined as necessary plaintiffs under F.R.C.P. 19(a). Rule 19(a) provides that:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action *shall be joined* as a party in the action if (1) in the person's absence complete relief

cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest . . .

Fed.R.Civ.P. 19(a) (*emphasis added*).

 Defendants argue that Brasil and Bahamas Holdings must be joined as plaintiffs to the fraudulent inducement and breach of contract claims pursuant to Rule 19(a) because they were parties to the 2001 Stock Purchase Agreement. (Floris Def. Mem. at 10). However, while "[i]t is well-established that a party to a contract which is the subject of the litigation is considered a necessary party," *Ryan v. Volpone Stamp Co., Inc.*, 107 F.Supp.2d 369, 387 (S.D.N.Y.2000) (citations omitted), Plaintiffs' breach of contract claim arises not out of the 2001 Agreement but the warranties, re-certifications of warranties, and indemnification provision contained in the 1998 Stock Purchase Agreement (*See* Compl. ¶¶ 105–107). Moreover, to the extent that Brasil and Bahamas Holdings have an interest in the breach of contract claim by virtue of the indemnification rights granted to BAC "affiliates" under the 1998 Agreement's indemnification provision (see Weinberg–Brodt Decl., Ex. B. § 10.2), this interest will be adequately protected by BAOC and BIFC, Brasil and Bahamas Holdings' corporate parents, who have invoked these same indemnification rights in bringing their breach of contract claim. *See Bayer Corp. v. Smithkline Beecham PLC*, No. 95 Civ. 5582, 1996 WL 34164, at *5 (S.D.N.Y. Jan, 29, 1996) (subsidiaries with an interest in parent's action

were not necessary where "both subsidiaries are fully owned by, and their interests are identical to, their respective parents"). Finally, because their interest is sufficiently protected by BAOC and BIFC, Brasil and Bahamas Holdings are in privity with and would be bound by any judgment on the breach of contract claim in this case under the doctrine of res judicata, thereby eliminating Defendants' risk of incurring double or inconsistent liability. Accordingly, Brasil and Bahamas Holdings are not necessary parties to the breach of contract claim. *See Lufti v. Dow Jones*, 95 Civ. 8779, 1996 WL 343065, at *2 (S.D.N.Y. June 20, 1996) (noting that "a corporate parent is deemed to be in privity with its subsidiary" for res judicata purposes "when it sufficiently represents that subsidiary's interests") (citations and internal quotations omitted), *aff'd*, 107 F.3d 3 (1997); *JSC Securities, Inc. v. Gebbia*, 4 F.Supp.2d 243, 251 (S.D.N.Y.1998) (same). Thus, Brasil and Bahamas Holdings do not have to be joined as plaintiffs to the breach of contract claim.

Similarly, while BAC's fraudulent inducement claim arose in part out of the 2001 Stock Acquisition, which was in turn consummated by execution of the 2001 Stock Purchase Agreement, it is the Acquisition itself rather than the terms of that Agreement which is the focus of this cause of action. (*See* Compl. ¶¶ 75–85). Moreover, as a corporate grandparent of Brasil and Bahamas Holdings who seeks the same relief on this claim that the latter entities would seek, namely recovery of the

monies paid to purchase the BL Banks stock at artificially inflated prices, BAC will sufficiently protect Brasil and Bahamas Holdings' interests with respect to this claim, and the latter entities are therefore in privity with and will be bound by any judgment against BAC on this cause of action thereby eliminating the danger of double or inconsistent liability being imposed on Defendants. Thus, Brasil and Bahamas Holdings are also not necessary parties to the fraudulent inducement claim.[24]

**E. Forum Non Conveniens**

Finally, Defendants argue that the present action should be dismissed on forum non conveniens grounds. (Def Mem. at 23–25). Forum non conveniens, a common law doctrine which the United States Supreme Court imported into the federal courts in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), permits a federal court to dismiss a case over which it has jurisdiction and in which venue is otherwise proper when "dismissal would 'best serve the convenience of the parties and the ends of justice.'" *Murray v. British Broadcasting Corp.*, 81 F.3d 287, 290 (2d Cir.1996) (quoting *Koster v. American Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). The doctrine "presupposes at least two forums in which the defendant is amenable to process"— the chosen federal court on the one hand and either an alternative state court or court of a foreign country on the other[25]—

24. However, Plaintiffs may, if they wish, still join the BL Banks and/or Brasil and Bahamas Holdings as plaintiffs to the present action pursuant to Rule 20(a). *See* F.R.C.P. 20(a) ("All persons may join in one action as plaintiffs if they assert any right to relief ... in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all these persons will arise in the action.").

25. The power granted federal courts under the forum non conveniens doctrine is therefore distinct from the federal venue transfer statute, 28 U.S.C. § 1404(a), which permits federal courts to transfer rather than dismiss cases on similar grounds, but only to other federal courts. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253, 102 S.Ct. 252, 264–65, 70 L.Ed.2d 419 (1981) (specifying that " § 1404(a) transfers are different than dismissals on the ground of forum non conve-

and "furnishes the criteria for choice between them." *Gilbert,* 330 U.S. at 507, 67 S.Ct. at 842.

As far these criteria go, "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981). However, the degree of deference accorded the plaintiff's forum choice depends on the residency of the plaintiff, for while, on the one hand, "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen [his] home forum," *Piper,* 454 U.S. at 255, 102 S.Ct. 252, "the choice of a United States forum by a foreign plaintiff is entitled to less deference." *Iragorri v. United Technologies Corp.,* 274 F.3d 65, 71 (2d Cir.2001) (citing *Piper* ). Nevertheless, the rule is not "so abrupt or arbitrary" as to give deference to the plaintiff's choice "only when the plaintiff sues in the plaintiff's home district." *Id.* at 72. Instead, the Second Circuit has adopted a "sliding scale" concept of deference, giving "greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons," like convenience, "and diminishing deference" to a plaintiff's forum choice to the extent it was motivated by tactical advantage, i.e., forum-shopping. *Id.* at 73. Thus, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens." *Id.* at 72.

Beyond the plaintiff's forum choice, the Supreme Court has set out a list of private and public interest factors that a district court must weigh in determining whether forum non conveniens dismissal is proper. The private interest factors relate to the convenience of the litigants themselves and include: (1) the relative ease of access to proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; (3) possibility of view of premises; (4) enforceability of a judgment if one is obtained; and (5) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843. The public interest factors, meanwhile, include: (1) preventing congestion of the court's docket; (2) the local interest in having localized controversies decided at home; (3) the appropriateness of trying a case in a forum that is at home with the state law that must govern the case; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of forum law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*

Because a forum non conveniens inquiry requires flexibility, no one factor "will justify or require either grant or denial of remedy." *Piper,* 454 U.S. at 249–50, 102 S.Ct. 252 at (quoting *Gilbert* ). However, a defendant's burden with respect to these factors is always high; "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843; *see also Iragorri,* 274 F.3d at 74–75 (noting that even when a plaintiff's forum choice is entitled to a lesser degree of deference, "the action should be dis-

niens" and that "[d]istrict courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of forum non conveniens"); *Schertenleib v. Traum,* 589 F.2d 1156, 1161 (2d Cir.1978) (noting that

"the 'inherent power' of district courts to utilize forum non conveniens still exists in situations ... where section 1404(a) cannot apply because the more convenient forum is not a United States district court.")

missed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable").

### 1. Existence of an Alternative Forum

 "The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'" *Murray,* 81 F.3d at 292 (quoting *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22). In the present case, Defendants, although not explicitly naming an alternative forum in which to litigate the present dispute, seem to suggest Brazil, the Bahamas and the Cayman Islands as possible alternative fora. (*See* Def. Mem. at 24). However, because Defendants have failed to show that they would in fact be subject to service of process in any of these jurisdictions, forum non conveniens dismissal in this case, even if otherwise appropriate under the *Gilbert* criteria, would have to be conditioned upon Defendants being amenable or agreeing to submit to the jurisdiction of one of these alternative fora. *See Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 983–84 (2d Cir. 1993) (noting that forum non conveniens dismissals can be "appropriately conditioned to protect the parties opposing dismissal") (citing cases); *Alfadda v. Fenn,* 966 F.Supp. 1317, 1334 (S.D.N.Y.1997) ("To the extent plaintiffs might be concerned that some defendants are not amenable to process in France, the Court will condition its order of dismissal on defendants making themselves amenable to French process."), *aff'd,* 159 F.3d 41 (2d Cir.1998).

### 2. Deference Accorded Plaintiffs' Forum Choice

 While none of the Plaintiffs are residents of New York State-all were incorporated and/or have their principal places of business in North Carolina or California (Compl.¶¶ 8–11)—all are business entities based in the United States, and both BAC and BNA "have offices and significant operations in the Southern District of New York." (*Id.*). Moreover, the alleged overdrafts by Defendant Lemgruber, which form much of the basis for Plaintiffs' causes of action in this case, were allegedly "made primarily by wire transfer through [BL Bahamas'] correspondent banks in New York City." (*Id.* ¶ 36). Thus, both the Plaintiffs and the lawsuit itself have bona fide connections to the Southern District of New York which entitle Plaintiffs' choice of this forum to significant deference.

 In addition, Plaintiffs note that their forum choice is consistent with the forum selection clause contained in § 12.5 of the 1998 Stock Purchase Agreement and incorporated by reference into the Lemgruber Management Agreement, which specifies that any action "seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought ... in the United States District Court for the Southern District of New York." (Pl. Mem. at 23–24; Weinberg–Brodt Decl., Ex. B at 67; Goldstein Decl., Ex. D Cl. XI). As Defendants themselves acknowledge (*see* Def Mem. at 23–24), a plaintiff's forum choice that is consistent with a mandatory forum selection clause in a contract signed by the parties and encompassing the causes of action brought by the plaintiff is entitled to "nearly conclusive deference". *LSP–Kendall Energy, LLC v. Dick Corp.,* No. 03 Civ. 2751, 2003 WL 21705223, at *3 (S.D.N.Y. July 23, 2003); *see also M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 18, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513 (1972) (party seeking to defeat freely-negotiated contractual forum selection clause must "show that trial in the contractual

forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court"); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 206–07 (S.D.N.Y.2002) ("The existence of a forum selection clause also counsels strongly against dismissal of an action based on forum non conveniens.") (citation omitted).

However, Defendants argue that none of Plaintiffs' claims are actually covered by the aforementioned forum selection clause because the claims arise not out of the 1998 Stock Purchase Agreement but the 2000 and 2001 Stock Purchases and their coinciding agreements either lack forum selection clauses altogether or expressly specify Rio De Janeiro, Brazil as the proper forum. (Def. Mem. at 23–24). Plaintiffs meanwhile contend that both of their claims are covered by the 1998 Agreement (Pl. Mem. at 23–24), citing a line of federal case law which holds that "in the face of strong public policy in favor of forum selection clauses," the scope of such clauses "is not restricted to pure breaches of contracts containing the clauses," *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.1993), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993), but also encompasses "claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if the gist of those claims is a breach of that relationship." *Direct Mail Production Services, Ltd. v. MBNA Corp.*, No. 99 Civ. 10550, 2000 WL 1277597, *6 (S.D.N.Y. Sep.7, 2000) (citations and internal quotations omitted); *see also Bense v. Interstate Battery Sys. of America*, Inc., 683 F.2d 718, 720 (2d Cir.1982) (holding that forum selection clause covering "any suits or causes of action arising directly or indirectly from this Agreement" applied to antitrust claim whose "gist is that [defendant] wrongfully terminated the agreement").

The forum selection clause contained in the 1998 Stock Purchase Agreement clearly covers Plaintiffs' breach of contract claim. The claim both seeks to enforce the warranty provisions of § 3 of the Agreement and is based on indemnification rights contained in § 10.2 of the Agreement. Accordingly, there is a strong presumption against dismissal of this claim on forum non conveniens grounds.

In contrast, the language of the forum selection clause at issue does not encompass BAC's fraudulent inducement claim. The claim does not seek to enforce any specific provision of the 1998 Stock Purchase or Management Agreements, nor is it based on a right specific to either or both of these agreements. Moreover, even if the fraudulent inducement claim can be said to have arisen indirectly out of the 1998 Stock Purchase Agreement since the 2000 and 2001 stock purchases were consummated pursuant to the call option provided for in § 11.2 of the 1998 Agreement, the *Roby-Bense* rule is not implicated because the language of the clause at issue here, referring to claims "seeking to enforce any provision of, or based on any right arising out of" the Agreement (Weinberg–Brodt Decl., Ex. B at 67), is much narrower than the clauses at issue in those cases. *See Bense*, 683 F.2d at 720 ("any suits or causes of action arising directly or indirectly from this Agreement"); *Roby*, 996 F.2d at 1359 ("any dispute and/or controversy of whatsoever nature arising out of/ or relating to the [matters covered by the contract]"); *see also Bon Jour Group, Ltd. v. Elan–Polo, Inc.*, No. 96 Civ. 6705, 1997 WL 401814, at *2 (S.D.N.Y. July 16, 1997) (holding that fraudulent inducement claim was not covered by forum selection clause applicable to "litigation between the parties concerning the alleged breach of this agreement or the meaning, effect, application and/or interpretation of its terms"). Thus, with respect to the fraudu-

lent inducement claim, Plaintiff's choice of the Southern District of New York is not entitled to "near conclusive" deference, although, as discussed above, Plaintiff's forum choice must still be given significant deference.

### 3. Private and Public Interest Factors

Because Plaintiffs' choice of this forum must be afforded significant and, with respect to their breach of contract claim, "nearly conclusive" deference, the Court can only dismiss the present action on forum non conveniens grounds if the *Gilbert* private and public interest factors weigh heavily in favor of litigation in one or both of the alternative fora.

With respect to the private interest factors, Defendants principal argument is that because "virtually all of the events pertinent to the purchases [of the BL Banks]" took place in Brazil and the Bahamas, these two fora provide greater access to relevant documents and potentially material witnesses that are currently "beyond the discovery jurisdiction and subpoena power of this Court." (Def Mem. at 24–25). However, while Defendants may be correct with respect to certain potential witnesses no longer employed by any of the parties, their characterization of the location of relevant documents is an exaggeration because many of the alleged "overdrafts" and "sham covering transactions" forming the basis of Plaintiffs' claims involved transfers of money to accounts in the United States, including one in New York City. (*See* Compl. ¶¶ 36, 45). Thus, some of these sources of proof are likely located within the United States, even in New York City. Moreover, because Plaintiffs' claims center around the financial condition of the BL Banks, many relevant documents are likely in the possession of the BL Banks themselves and thus under the control of Plaintiffs as the Banks' corporate parents, making them accessible to Defendants even in this fo-

rum through Rule 34 document requests served on Plaintiffs. *See Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, No. 01 Civ. 3016, 2002 WL 1835439, at *4 (S.D.N.Y. Aug. 8, 2002) (holding that, under F.R.C.P. 34, defendant corporate parent had control over and thus had to produce requested documents in the possession of non-party wholly owned subsidiary); *Lethbridge v. British Aerospace PLC*, No. 89 Civ. 1407, 1990 WL 194915, at *1 (S.D.N.Y. Nov. 28, 1990) (applying same principle to indirect corporate parent-subsidiary relationship).

■■■ Furthermore, should Plaintiffs obtain a judgment against Defendant Lemgruber in this Court, they would likely be able to enlist the assistance of Brazilian authorities to enforce it, given the latter's demonstrated interest in investigating and prosecuting Lemgruber and others affiliated with BL Banks who are accused of committing fraud within the Brazilian banking industry. (*See* Compl. ¶¶ 50–53). Finally, in terms of "other practical problems" that impact the difficulty and expense of trying a case, the Court agrees with Judge Newman of the Second Circuit that "in light of the realities of modern transportation and communications ... [a] forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel." *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J. concurring), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). Thus, the cost and time associated with traveling and transporting materials to this District from Brazil and the Bahamas in order to litigate this case does not appear to place a significant burden on Defendants.

As for the public interest factors, while none of the parties to this litigation are residents or citizens of New York, New

York's interest in this case is still significant given that the alleged overdrafts at the heart of the dispute involved New York banks (Compl.¶ 36). Moreover, because BAC and BNA conduct "substantial operations" in New York (Compl.¶¶ 9–9), the many New York residents who are employed by or have accounts or investments with these Plaintiffs are no doubt interested in these Plaintiffs recovering millions of dollars of lost investments. In addition, because, as neither side disputes, Plaintiffs' claims are governed by New York law, with which this Court undoubtedly has more familiarity than do Brazilian and Bahamian courts.

Thus, overall, the *Gilbert* factors, at best, weigh only slightly in favor of one or both alternate fora, which is certainly not enough to overcome the heavy presumption in favor of Plaintiffs' choice of this forum for their breach of contract claim and the only slightly lesser deference accorded this forum choice for the fraudulent inducement claim. *See LSP–Kendall,* 2003 WL 21705223, at *3 ("extremely small balance of public interest factors" favoring forum non conveniens dismissal was "insufficient to overcome the deference due plaintiffs' choice of forum" consistent with forum selection clause). Moreover, even if the balance was otherwise enough to overcome the slightly lesser deference due Plaintiffs' forum choice for the fraudulent inducement claim, the prospect of dismissing one claim and not the others, and thus requiring the present dispute to be litigated in two fora, would tip the scales against dismissal. *See Concesionaria DHM, S.A. v. Int'l Finance Corp.,* 307 F.Supp.2d 553, 563 (S.D.N.Y.2004) (holding that the balance of private and public factors would weigh against forum non conveniens dismissal "because granting the motion would require the plaintiff to pursue the case in two fora."). Accordingly, forum non conveniens dismissal of this action is not appropriate.

▮ In the alternative, Defendants request leave to file an additional brief in order to further develop their forum non conveniens argument. (Def. Mem. at 23 n. 18). However, while, contrary to Plaintiffs' contention, a defendant does not waive his right to move for forum non conveniens dismissal if he fails to raise it in his Rule 12 pre-answer motion, *see Snam Progetti, S.P.A. v. Lauro Lines,* 387 F.Supp. 322, 323 (S.D.N.Y.1974); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F.Supp.2d 722, 742 (S.D.N.Y.2001), Defendants have already raised forum non conveniens in the present motion, and the Court sees no reason to give them a second bite of the apple. Accordingly, their request to brief further the forum non conveniens issue at this stage of the litigation is DENIED.

### F. Leave to Amend

Finally, the Court must determine whether to grant Plaintiffs leave to amend their Complaint to cure the deficiencies that have caused dismissal of their conversion and breach of fiduciary duty claims and the Edge Act Plaintiffs' fraudulent inducement claim for lack of standing. Under Federal Rule of Civil Procedure 15(a), "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). While "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Industries, Inc.,* 949 F.2d at 48 (citing *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990)), a court may dismiss without leave to amend when amendment would be futile. *Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). Ultimately, however, the decision to grant leave to amend a complaint rests within the discretion of the district court. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230.

With deference to the liberal intent of Rule 15(a), the Court grants Plaintiffs leave to amend the Complaint for the limited purpose of either removing causes of action consistent with this Opinion or adding parties necessary to preserve these claims.

### III. CONCLUSION

For the reasons stated above, the Lemgruber Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART AS FOLLOWS:

(1) All instant Plaintiffs' causes of action for conversion and breach of fiduciary duty are DISMISSED WITH PREJUDICE for lack of standing;

(2) The Edge Act Plaintiffs' cause of action for fraudulent inducement is also DISMISSED WITH PREJUDICE for lack of standing;

(3) BAC's fraudulent inducement claim and all Plaintiffs' breach of contract claims sufficiently plead justifiable reliance under F.R.C.P. 9(a) and 12(b)(6), and therefore Defendants' motion to dismiss these claims is DENIED;

(4) The Court has federal subject matter jurisdiction over these two remaining causes of action pursuant to the Edge Act, 12 U.S.C. § 632, and 28 U.S.C. §§ 1331 and 1367;

(5) Non-parties the BL Banks and Brasil and Bahamas Holdings are not necessary parties to this action under F.R.C.P. Rule 19(a);

(6) Dismissal of this action on grounds of forum non conveniens is DENIED.

In accordance with this Opinion, Plaintiffs may amend their Complaint within forty-five (45) days of the date of this Opinion. Plaintiffs are also hereby ORDERED to show cause within thirty (30) days of the date of this Opinion why Defendants Interbrett Investec Group and American Versailles Fund who have not been served with the Original Complaint or even located as of the filing of this Opinion should not be dismissed from this action pursuant to Federal Rule of Civil Procedure 4(m) for failure to serve in a timely fashion. Further, as to Defendants Goldbeach Holding Corp., Tiger International Overseas Corp., Blue Water Capital, and Delaware Asset Management ADM Financiera e Consultoria, all of whom have been served with but have yet to respond to the Original Complaint, Plaintiffs are hereby ORDERED, within thirty (30) days of the date of this Opinion, either (1) to move for default judgment or (2) to show cause why Plaintiffs' claims should not be dismissed for failure to prosecute. *See Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 42 (2d Cir.1982) (holding that a district court's authority to dismiss an action for plaintiff's failure to prosecute "cannot seriously be doubted"). Plaintiffs may only move for default on those causes of action that can be maintained in accordance with this Opinion, and their showings of good cause, if any, shall be made by affidavit.

Within thirty (30) days of being served with the Amended Complaint, or within 30 days of expiration of Plaintiffs' time to amend, all remaining Defendants shall answer the Complaint.

SO ORDERED